

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-7-2002

# Gao v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 01-3472

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Gao v. Atty Gen USA" (2002). *2002 Decisions.* Paper 483.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/483

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed August 7, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3472

CHEN YUN GAO, Petitioner

v.

John Ashcroft, Attorney General
of the United States, Respondent

On Petition for Review of an Order of the
Board of Immigration Appeals
(Board No. A 77 341 155)

Argued: May 20, 2002

Before: BECKER, Chief Judge, GREENBERG,
Circuit Judge, and BARZILAY, Judge, U.S. C ourt of
International Trade.*

(Filed August 7, 2002)

        J. JACK ARTZ, ESQUIRE (ARGUED)
        1730 Huntington Drive, Suite #205
        South Pasadena, CA 91030

Counsel for Petitioner

_____

*Honorable Judith M. Barzilay, Judge, United States Court of
International Trade, sitting by designation.


        ROBERT D. McCALLUM, JR.,
         ESQUIRE
        Assistant Attorney General,
         Civil Division
        TERRI JANE SCADRON, ESQUIRE
        Senior Litigation Counsel
        Office of Immigration Litigation
        JOHN M. McADAMS, JR., ESQUIRE
         (ARGUED)
        Office of Immigration Litigation
        Civil Division
        U.S. Department of Justice
        P.O. Box 878, Ben Franklin Station
        Washington, DC 20044

        Counsel for Respondent

OPINION OF THE COURT

BARZILAY, Judge, U.S. Court of International Trade:

The world has recently come to know Falun Gong as a movement in the People's Republic of China that"blends aspects of Taoism, Buddhism, and the meditation techniques of Qigong (a traditional martial art) with the teachings of Li Hongzhi." U.S. Dep't of State, Human Rights Report for 1999, China, February 25, 2000, available at http://www.state.gov/www/global/human_rights/1999_hrp_report/china.html. As the news media has widely reported, in July, 1998, the Chinese government officially declared Falun Gong illegal and began a nationwide crackdown against the movement, launching a massive propaganda campaign against the group. The government "rounded up and detained [tens of thousands of practitioners] for several days, often in open stadiums with poor, overcrowded conditions with inadequate food, water and sanitary facilities. Practitioners who refused to renounce their beliefs were expelled from their schools or fired from their jobs." Id.

According to the State Department Report, "despite the harshness of the crackdown, Falun Gong demonstrations

2

continued around the country throughout the summer and into the fall. Authorities responded quickly by breaking up demonstrations--at times forcibly--and detaining demonstrators." Id. There have also been"credible reports of beatings and deaths of practitioners in detention who refused to recant their beliefs." Id."According to Amnesty International, some adherents of Falun Gong [have been] tortured with electric shocks, as well as having their hands and feet shackled and linked with crossed steel chains." Id. It is against this back-drop that this appeal comes to us.

Chen Yun Gao (Gao), a young woman of 18, is a native and citizen of China, who escaped to the United States after being expelled from school, beaten, and imprisoned in a labor camp. Although the record clearly demonstrates that Gao has an extensive history of school truancy, and that she spent a lot of time participating in t'ai chi and other athletic endeavors, on the record before us it does not appear that any action was taken by the school authorities or the Chinese government against Gao until they learned that she was a messenger for the Falun Gong. It is on this ground, her fear of persecution if she returns to China on account of this Falun Gong connection, that she applied for political asylum and for withholding of deportation to China. Her application was denied following a hearing before an Immigration Judge (IJ) who found that Gao lacked credibility based upon inconsistencies in her story. The Board of Immigration Appeals (BIA) summarily affirmed the decision of the IJ. She petitions for review of the BIA's decision.

Gao's case is not a human rights cause celebre -- she was not even a practitioner of Falun Gong, and was no more than a mere messenger, drawn into the organization's

network through the influence of her aunt. For this reason, the IJ concluded that Gao's messenger activities could not be the reason for the action taken against her. That conclusion was improper. Careful scrutiny of the record also shows that there are no significant inconsistencies in her story. Additionally, the IJ failed to consider important documentary evidence that supports claims that Gao made during the hearing. Although it may be that Gao may not prevail upon a fuller review of the record, these problems

3

with the IJ's decision, explicated below (which are especially troubling in view of the State Department Report detailing a reign of terror against Falun Gong) require us to grant the petition for review and remand this case for further proceedings.

I. BACKGROUND

Gao arrived at Los Angeles International Airport on October 31, 2000. Lacking proper documentation, she was served with a Notice to Appear by the Immigration and Naturalization Service (INS). The Notice charged her with removability as an alien who was likely to become a public charge, and as an immigrant who at the time of her application for admission did not possess a valid visa. 8 U.S.C. SS 1182(a)(4)(A); 1182(7)(A)(i)(I). Gao responded by filing an application for asylum pursuant to 8 U.S.C. S 1158(b)(1), for withholding of removal, and for protection under Article 3 of the Convention Against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment. The application was grounded on the claim that her association with the banned Falun Gong movement in China led to her expulsion from school, beating, and imprisonment at the hands of local security forces. Gao's asylum application, prepared by her attorney, contained minimal explanation as to the reasons for her asylum claim; we rescribe it in the margin.1 On February 8, 2001,

_____

1. Gao's asylum application reads as follows:

I am an 8th grade student at CHAO YANG HIGH SCHOOL in 03/2000 when one of my relatives (my aunt) named Yu Gao recruited me as a messenger to the Falun Gong group in my area. She paid me 150 RMB per month. I was absent from class many times because of my messenger activities. The school took disciplinary measures against me, so I stopped my activities with the group for a while.

Again I participated in the group in May 2000. The principal learned that I was absent again from class. The principal ordered me to stop participating in the group, but I did not obey him. The principal reported me to the local public security, and they came to the school to arrest me immediately after I was formally expelled. The principal announced my expulsion to the school on 6/13/2000

4

she was given a hearing before the IJ, at which time she was allowed to develop her story by presenting oral testimony and documentary evidence. The IJ based his opinion primarily on that testimony and some of the documentary evidence submitted at the hearing. The evidence may be summarized as follows.

Gao testified that she was a high school student in Fujian Province. Her aunt, Gao Yu, was an active member and instructor in the Falun Gong movement. Gao was apparently close to her aunt, and would often accompany her when she went to meetings or ran errands. This loose association with the Falun Gong began in 1998. In March 2000, Gao's aunt recruited her to be a paid messenger for the group, which meant that she was frequently working for the Falun Gong instead of attending school.

On June 13, 2000, she was expelled from her school. School officials reported her connection to the Falun Gong to the local police, who arrested Gao and held her for two days. During that time she claims that she was held without food and kept awake for long periods. She also says that police made her remove her pants and beat her on her buttocks. The instrument they beat her with was a long rod, which may or may not have been able to deliver an electric charge. Gao does not know if she was electrocuted,

---

> while we were in class. The public security, who were waiting for me at the school, took me to the police station where they detained me for two days, scolded me, and beat me.
>
> The public security threatened that they would seal my house and expel my family from it. Then on 6/16/2000 they took me with other detainees to forced labor in the countryside. I managed to escape and my parents quickly moved me to a relative's house in Fu Zhou City. I stayed there in hiding until 8/23/2000. My parents and our relatives arranged an escape from China to the USA where I could obtain asylum for this situation.
>
> I flew from Chang Le to Guan Zhou City on 8/23/2000. I stayed in Guan Zhou City for a night and flew to Thailand on 8/24/2000. I flew from Thailand to Brazil on 9/23/2000. I arrived in Los Angeles on 10/31/2000.

[A.R. 341].

only that she was struck twice and kicked. Police also allegedly threatened to lock up her family and "sell" or "seal" her house.2 After this two day incarceration she was released, then arrested again on June 16, 2000. At that point she was placed with a group of prisoners who were taken to a park and made to perform manual labor such as cutting grass and moving stones. Gao testified that during a lunch break when the two guards supervising the group

were not paying attention, she escaped into a wooded area. She first went home, then her parents sent her to a relative's house in a city about 100 miles away. She remained there for a few months before fleeing the country. She traveled through Thailand and Brazil before arriving in Los Angeles.

Gao submitted two significant pieces of documentary evidence at her hearing. The first was her high school student transcript book, a booklet that was used by the school to record grades and comments by her teachers beginning in 1998 and ending in 2000, the relevant portions of which are detailed in the margin.3 The second

---

2. There are two points in the record where Gao recounts this threat. In her statement attached to the application Gao says,"they would seal my house and expel my family from it." [A.R. 341]. In her testimony she says, "they would lock my family up and they would sell my house." [Id. at 108].

3. The relevant transcript pages show that Gao received comments relating to her exercise habits starting in 1998:

1) 1998 to 1999 – 1st Semester

>  "Reward or Penalty: Joined those exercises activities and was absent for 18 times, Appointed to be criticized." [A.R. 163].

>  "Comment:

>  This student was good and behaved . . . but shows more interest in those body exercises, feels strong for the class honor, but has been absent 18 times because of joining those body exercises, after receiving criticisms from the Policy and administration department of school, we hope that she will correct those mistakes and get better progress." [A.R. 164].

2) 1998 to 1999 – 2d Semester

was the Discipline Determination letter from the school stating the grounds for her expulsion. The letter states that Gao:

>  keeps on joining the Fa Lun Gong activities as their messenger. [S]he was questioned by the local justice department in June and has been absent from class for 56 times since then . . . . Based on regulation 11 section 4 (continuous high school discipline violation, law violation regulation) and the regulations of the public security authority . . . GAO Chen Yun is expelled from school, this case is reported to the public security bureau and be processed based on the regulation.

[A.R. 388].

The IJ, in an oral opinion, denied Gao's application for asylum based on the facts of her case. He did, however, recognize that an association with the Falun Gong could subject one to a well founded fear of persecution. 4 Based on

_____

    "Comment:

    This student . . . always joins those outdoor exercise that has been late for class for many times, we hope that she pays more attention to the school rules and organization."[A.R. 167].

3) 1999 to 2000 - 2st Semester

    "Comment:

    This student shows emotional thinking, joins those outdoor exercises too often that she gets slow progress, can not catch up with other students, not active in class, we hope that the parents can help her with her thinking and her mind to focus into study, do not join those outdoor exercises again which affects her study and progress." [A.R. 170].

4) 1999 to 2000 - 2d Semester

    "Comment:

    This student has fallen into last sixth in class, does not pay attention in class, classmates say that she often joins those outdoor social exercises, does not listen to the class instructor after talking with her. . . ." [A.R. 173].

4. The IJ found that removal on grounds that Gao would become a public charge was not sustainable on the evidence.

background information, he observed that the Falun Gong is not just a small religious group but a "social phenomenon" in China that has "attracted the attention of Chinese government authorities," and caused some friction in relations between the United States and China.[A.R. 39]. Therefore, the IJ found, "the respondent's niche in China is one that could under certain circumstances be persecutory, or cause her persecution." [A.R. 40]. The IJ accepted "that the Falungong belief and activity is a religious, and/or political view, and persecution on account of it is persecution on account of one's religious or political views." [A.R. 42].

Gao, in her testimony, clarified that she was not practicing Falun Gong, but acting as a messenger and it was that association that puts in her in danger. The IJ stated that if a person were actually tortured for being a messenger, "the Court believes that that would constitute persecution." [A.R. 44]. The question then became whether Gao's testimony "regarding the treatment that she suffered is plausible, sufficiently detailed, and credible to allow us to conclude that she was in fact persecuted for these few

activities." [Id]. The IJ found that Gao lacked credibility. Most importantly, without any evidence to support this conclusion, the IJ stated that he found "implausible . . . the preoccupation of Chinese authorities for someone who is a mere adjunct to the activity that the government is trying to stop or prevent, bur that is not at all involved in it herself." He therefore denied her claim of asylum.

II. STANDARD OF REVIEW

We begin by noting that we have the power to review only the final order of removal. 8 U.S.C. S 1252(a)(1). Ordinarily, Courts of Appeals review decisions of the Board of Immigration Appeals (BIA), and not those of an IJ. When the BIA does not render its own opinion, however, and either defers or adopts the opinion of the IJ, a Court of Appeals must then review the decision of the IJ. Abdulai v. Ashcroft, 239 F.3d 542, 549 n.2 (3d Cir. 2001) ("When the BIA defers to an IJ, a reviewing court must, as a matter of logic, review the IJ's decision to assess whether the BIA's

8

decision to defer was appropriate."). In addition, the scope of our review is extremely narrow:

> The Attorney General has been "charged with the administration and enforcement" of the INA, and Congress has provided that his "determinations and rulings . . . with respect to all questions of law shall be controlling." 8 U.S.C. S 1103(a)(1). Because of this delegation, the Supreme Court has held that "principles of Chevron deference are applicable" in the immigration context. INS v. Aguirre-Aguirre, 526 U.S. 415, 424, 143 L. Ed. 2d 590, 119 S. Ct. 1439 (1999). The Court has also emphasized that--because of the area's profound foreign policy implications--"judicial deference to the Executive Branch is especially appropriate in the immigration context." Id.  at 425. And because the Attorney General has vested the BIA with the power to exercise the "discretion and authority conferred upon [him] by law," see 8 C.F.R. S 3.1(d)(1) (2000), these principles of deference also apply to the BIA. See Aguirre-Aguirre, 526 U.S. at 425.

Id. at 551.

A grant of asylum under S 1158(b)(1) of the Immigration and Nationality Act (INA) allows an otherwise removable alien to stay in the United States. The Attorney General "may" grant asylum to an alien who demonstrates that he/she is a refugee: a person unable or unwilling to return to the country of that person's nationality or habitual residence because of past persecution or because of a well-founded fear of future persecution on account of his race, religion, nationality, membership in a particular social group, or political opinion. See I.N.A.S 208(b)(1), 8 U.S.C. S 1158(b)(1) (requiring asylum applicant conform to definition of refugee); 101(a)(42)(A), 8 U.S.C.S 1101(a)(42)(A)

(providing definition of refugee). In order to establish eligibility for asylum on the basis of past persecution, an applicant must show: "(1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of ' one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either 'unable or unwilling' to control." Navas v. INS, 217 F.3d 646, 655 (9th Cir. 2000).

An applicant can demonstrate that she has a well-founded fear of future persecution by showing that she has a genuine fear, and that a reasonable person in her circumstances would fear persecution if returned to her native country. Elnager v. INS, 930 F.2d 784, 786 (9th Cir. 1991). Aliens have the burden of supporting their asylum claims through credible testimony. Abdille v. Ashcroft, 242 F.3d 477, 482 (3d Cir. 2001). Testimony, by itself, is sufficient to meet this burden, if "credible." 8 C.F.R. S 208.13(a), Chan v. INS, 222 F.3d 1066, 1077 (9th Cir. 2000). In some cases the INS may require documentary evidence to support a claim, even from otherwise credible applicants, to meet their burden of proof. Abdulai, 239 F.3d at 554.

Whether an asylum applicant has demonstrated past persecution or a well-founded fear of future persecution is a factual determination reviewed under the substantial evidence standard. Abdille, 242 F.3d at 483. The Court will uphold the agency's findings of fact to the extent that they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. Likewise, adverse credibility determinations are reviewed for substantial evidence. Balasubramanrim v. INS, 143 F.3d 157, 161 (3d Cir. 1998). The court must sustain the Board's adverse credibility determination if there is substantial evidence in the record to support it. Senathirajah v. INS, 157 F.3d 210, 216 (3d Cir. 1998). Under this standard, the Board's adverse credibility determination must be upheld on review unless "any reasonable adjudicator would be compelled to conclude to the contrary." INA S 242(b)(4)(B), 8 U.S.C.S 1252(b)(4)(B); accord INS v. Elias-Zacarias, 502 U.S. 478, 483-84 (1992). Adverse credibility determinations based on speculation or conjecture, rather than on evidence in the record, are reversible. Salaam v. INS, 229 F.3d 1234, 1238 (9th Cir. 2000). Generally, minor inconsistencies and minor admissions that "reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding." Vilorio-Lopez v. INS, 852 F.2d 1137, 1142 (9th Cir. 1988). The discrepancies must involve the "heart of the asylum claim." Ceballos-Castillo v. INS, 940 F.2d 513, 520 (9th Cir. 1990).

III. ANALYSIS

Although the substantial evidence standard grants significant deference to the determination of the IJ, we conclude that there are four problems with the IJ's determination that warrant reversal and remand in this case. First, notwithstanding his conclusion, it appears from the record that Gao's testimony and application have presented a consistent story that supports a finding of credibility on her part. Second, the IJ found that Gao's report cards conflicted with her testimony, but failed to distinguish between Gao's account and how she believed the school perceived those activities. Without clarifying if Gao altered the report cards, or if she adopted them as her testimony, the IJ found Gao's credibility was weakened because her story conflicted with the documents. This failure further undermines the decision. Third, the IJ failed to discuss and evaluate the Disciplinary Determination. Fourth, having concluded that Gao was not credible, the IJ also expressed doubt as to her story of escape and even her imprisonment, without demonstrating any foundation other than his suspicions that the story was not true.

A. Oral Testimony and Application

The IJ's decision cannot be supported by internal inconsistencies within Gao's story as developed by her testimony. Indeed, her application and her testimony present a consistent statement that Gao was a messenger for the Falun Gong. Gao's asylum application stated that she was "recruited" as a "messenger" for the Falun Gong. See supra note 1. Her oral testimony, recounted in the margin, also established that her association with the Falun Gong was as a messenger.[5]

_____

5. Her testimony during the hearing includes the following statements:

"I was practicing Falungong. I was a messenger." [A.R. 105].

"I was not practicing Falungong, I was a messenger. I work with my aunt." [A.R. 112].

"Q: Do you yourself practice Falungong?
A: Seldom. I, basically I was watching people practicing." [A.R. 114].

11

The IJ, however, made reference to what he believed was a change in her story once she was under cross-examination, the effect of which was to reduce her association with the Falun Gong from "practicing" to "messenger." He states: "It turns out in her testimony although she originally stated that what she was doing in China before she came to the United States was that she was 'practicing Falungong,' she later said during the same direct testimony, that in response to the question 'when did you start practicing' that she did not actually practice, that she was only a messenger." [A.R. 43]. The IJ does not cite the two contradictory statements. In searching the record,

we find only one quotation from Gao that indicates she "practiced" Falun Gong, and contrary to the IJ's characterization, this clarification does not come later in her testimony. She stated, "I was practicing Falun Gong. I was a messenger." [A.R. 105]. This statement was followed up with a clarification in the very same breath that her role was that of messenger. Other than this one instance, the IJ recited no significant inconsistencies between her oral testimony and her application. Therefore, we find no substantial evidence in the record undermining Gao's credibility with respect to her statements.

B. Report Cards

The IJ's determination essentially depends on his analysis of the report cards that were offered as supporting evidence by Gao's attorney. The documents were presented in a booklet form. Grades and comments were entered for each semester, with the book returned to the school for entry of new records after each semester. The individual

---

"Q: Well, ma'am, you weren't a member of Falungong you testified earlier, correct?
A: I was a messenger only, however, the government said that messenger is the, the worst person because they are the, the people who help communicate." [A.R. 122].

"Q: You can do some Falungong now?
A: I don't know the details. I watch people doing it, because my job is just a messenger." [A.R. 148].

12

reports have traditional columns of grades for various subject matter, as well as a comments section where a teacher or administrator could enter more specific written notes. In each of the three years from 1998 to 2000, Gao's report cards included handwritten comments which reference activities or exercises that were distracting her from her schoolwork. See supra note 3. The following summarizes the written comments for each semester and the IJ's comments and conclusions based on Gao's testimony concerning those written reports.

In Gao's report card for the spring of 2000, the comments said: "[C]lassmates say she often joins those outdoor social exercises." [A.R. 173]. The IJ had two problems with this comment. First, "according to the respondent's own testimony she was not involved in any outdoor social exercises. She was a messenger doing administrative type work for an organization whose members were doing outdoor social exercises." [A.R. 45]. Second, "similar comments are made on her report card the previous semester, the semester before that, and the semester before that, going all the way back to January 19 of 1999 relating to the fall semester of 1998." [A.R. 45] . The IJ apparently found these comments inconsistent with Gao's testimony on cross-examination, where she explained that she began

as a messenger for her aunt in March of 2000, and that prior to that she had been following her aunt to Falun Gong meetings since 1998, but that the school was not aware of this activity. [A.R. 121]. The suggestion by the IJ is that the reference to "social exercises" in the comments cannot be a reference to Falun Gong activities.

The January 1999 report, for the fall semester 1998, said that Gao "shows more interest in those body exercise [sic.], feels strong for the class honor, but has been absent for 18 times because of joining those exercise [sic.]. [A]fter receiving criticism from the party and administration department of school we hope that she will correct those mistakes and get better progress." [A.R. 164]. The IJ pointed out that when questioned about the January 1999 comments, Gao said she did not believe they had anything to do with Falun Gong, but instead related to other exercises like jumping, jogging and t'ai chi. Gao also said

13

that she did not receive the reported criticism. The IJ stated:

> [t]he Court finds this not very plausible. If the system is so strict that it is going to say that she should not be doing physical exercises outside school, exercises that have nothing to do with the castigated Falungong, and then such criticisms never occur, the apparent authoritarianism of the Chinese government is revealed to be much less strict than the booklet she presented would indicate it otherwise is.

[A.R. 47].

The June 1999 report said, "always joins those outdoor exercise that has been late for class many times." [A.R. 167]. When questioned about this report, Gao said that it did not relate to the Falun Gong activities as far as she knew. Then the IJ noted:

> She began to equivocate a little bit about her original written statement [her application]. She said that she was not a "formal messenger" at that time[meaning June 1999], but just followed her aunt around. In other words, she was implying that perhaps this had something to do with her Falungong activities as well, although she didn't simply come out and state that. The fact that she equivocated about this leads the Court to question whether the comments that we have in her report card reflect actual comments that were made, and caused the Court to question whether she herself may be aware that those comments do not necessarily reflect comments that were actually made at the time. At the very least, saying that she was following her aunt around earlier does not succeed in showing that the school knew about these Falungong activities and called them "joining those outdoor exercises" that deserved notation on her report card,

> nor does it show that she actually was involved in Falungong activities. Her statement says that her aunt "recruited me as a messenger to the Falungong in my area" in March 2000.

[A.R. 48, Emphasis Added].

14

The problem with the IJ's analysis is that the IJ does not distinguish between Gao's account of her involvement with the Falun Gong and how she believed the school perceived those activities. Gao consistently stated that in 1998 she began to follow her aunt and to attend meetings of the Falun Gong, without ever becoming a member. It was not until March 2000 that she assumed a formal position as a messenger. It was only after she assumed the formal role of messenger that she claims she was specifically criticized and singled out for persecution. Her statement, attached to her application, that the IJ references in the above-quoted excerpt, begins its narrative only in March 2000; testimony as to the background that led up to her formal association does not contradict her application statement which begins in 2000. See Aquilera-Cota v. INS, 914 F.2d 1375, 1382 (9th Cir. 1990) (credibility was questioned because "oral testimony included information not set forth in his asylum application," but court concluded that "failure to file an application form that was as complete as might be desired cannot, without more, properly serve as the basis for a finding of a lack of credibility").

The IJ does not focus on any differences between Gao's application and her testimony. Instead he focuses on her attempts to reconcile what is in her report cards with her actual activity. The IJ sees inconsistencies between Gao's statements and the statements of others, not among Gao's various recountings of her experience, which appear consistent. Gao attempted to explain why the school would have a different record of events than she claimed transpired. When asked directly about whether the school knew she was following her aunt to meetings, Gao said no, because they thought she was too young and she had denied that she was in the group. However, because Gao believed she had fooled the school as to the nature of her activity does not mean the school actually believed her story. The inconsistency between her testimony and the school reports is therefore, at best, speculative.

The IJ offers a possible reason why the report cards contradict her story, namely, that their veracity should be doubted. The IJ stated that the "Court finds it hard to believe, actually, that the comments about her involvement

15

in those outside activities were indeed put in her note booklet by the school itself." [A.R. 51]. However, neither the IJ, nor either counsel, made any attempt to identify who

made the alleged alterations in her school booklet. 6 If the IJ
believes that the alteration occurred and it impacts on his
finding of lack of credibility, he must state a reason and
detail with specificity the issues of non-credibility. See
Turcios v. INS, 821 F.2d 1396, 1399 (9th Cir. 1987) ("trier
of fact who rejects a witness's positive testimony because in
his or her judgment it lacks credibility should offer 'a
specific, cogent reason for [his] disbelief.' ' ") (internal
citations omitted). He does not.

Finally, having doubted the veracity of the reports cards,
the IJ then relies on them in concluding that Gao did not
truly participate in Falun Gong and therefore implies that
any discipline that Gao received was not a result of such
affiliation. The IJ says that the phrase "joining those
outdoor exercises" does not show that she was participating
in Falun Gong. [A.R. 48]. This is not only inconsistent with
the IJ's conclusion that the report cards were suspect, but
also appears to be a complete non sequitur, since Gao
never claimed that the report cards showed she was an
active member in Falun Gong prior to her becoming a
messenger in March 2000. She equivocated only when
attempting to explain her guess as to what was on the
minds of school officials, whom she believed were not
suspicious of her activities at that particular time. The IJ
failed to make this crucial distinction and finds
contradiction where none exists in her testimony:

> The respondent's testimony boiled down to simply
> saying that the school was suspicious of her, but that
> sounds a little bit more like a plat device for dealing
> with the fact that she could neither say that she was
> in Falungong at that time nor say she was not, because
> evidence in the hearing she had here was contradictory

---

6. Those who handled the documents included the school, Gao (before
she left China), Gao's parents in China, Gao's relatives in the United
States, and Gao's lawyer. The identity of the person who altered the
documents, if they were indeed altered, would have different implications
for Gao's credibility.

16

> on this question, and to deal with the contradiction she
> said that the school officials in effect were suspicious
> but did not know.

[A.R. 50].

Contrary to this statement by the IJ, Gao's testimony is
not contradictory as to the nature of her relationship with
the Falun Gong. Her testimony was that she began
following her aunt around in 1998, but that she did not
believe the school knew of this activity. In March 2000, she
began her role as a messenger, which she believes the
school discovered when a classmate reported her activity. It
was this discovery that she alleges led to her expulsion and
subsequent detention. If Gao misinterpreted the school's

early vague statements about social exercises to mean something other than Falun Gong, that does not make her story contradictory. Before her expulsion and arrest, she seems to have believed that the school did not know of her informal links to the Falun Gong. This is what she said in her testimony. In hindsight, the record indicates the school may have been more suspicious of her activity than she believed, but the IJ doubts the credibility of those documents. See Balasubramanrim, 143 F.3d at 162 (when document "may not represent an accurate account of the persecution . . . suffered . . the Board placed undue reliance on" it). However, whatever the school's suspicions or her beliefs about them, there is no evidence that contradicts what she claims actually happened -- that the school found out, at some point after March 2000, that she was a messenger for the Falun Gong, she was then expelled from school as a result, and subsequently imprisoned. Moreover, it is arbitrary to charge Gao with knowledge of what the school believed or what the comments in her grade reports appear to reference.

Adverse credibility findings are afforded substantial deference so long as the findings are supported by specific cogent reasons. See Turcios, 821 F.2d at 1399. The reasons must be substantial and bear a legitimate nexus to the finding. Aguilera-Cota, 914 F.2d at 1381. With respect to the evaluation of the report cards, we conclude that the IJ failed to ground his conclusion on substantial reasoning on the record, or provide a logical nexus between the report

cards and Gao's credibility. Without adequate reasoning supported by substantial evidence on the record, we cannot defer to the IJ's decision.

C. The Disciplinary Determination

The IJ's heavy reliance on the report cards as contradictory evidence of Gao's claims is especially troubling because the IJ failed to discuss in any way the other documentary evidence offered by Gao -- the Disciplinary Determination issued by the school. The document is a one paragraph explanation for the school's action. It includes a seal of the school, and notes that copies would be sent to Gao's parents and "[r]ecords of the school policy and administration department." It is titled: "Discipline Determination Regarding Student GAO Chen Yun's Violation." It is dated June 12, 2000. The text reads:

> Inspected junior high second grade (4) student GAO Chen Yun, female, born on 1983 March 17, this student during her school period, did not obey the school moral education, joined the so called social exercise movement by her own will; has been a messenger for the illegal group: Fa Lun Gong Group. She was absent from class for 43 times, the policy and administration department had educated her over and over, she still did not regret it and caused this serious

problem, this student was disciplined for a major demerit in March 2000, right now she keeps on joining the Fa Lun Gong activities as their messenger, she was questioned by the local justice department in June and has been absent from class for 56 times since then, she has set up a very bad influence. Based on regulation 11 section 4 (continuous high school discipline violation, law violation regulation) and the regulations of the public security authority, after the study and the decision of the school administration, GAO Chen Yun is expelled from school, this case is reported to the public security bureau and be processed based on the regulations.

[A.R. 388].

The government in its brief attempts to show that the primary reason for Gao's expulsion from school was absenteeism. The Disciplinary Determination explicitly contradicts this, and, if credible, makes clear that the primary reason for her expulsion was not school truancy, but rather her link to the Falun Gong. As the Disciplinary Determination suggests, the school took this link so seriously that they not only expelled her, but also noted in the letter they were referring the matter to the local public security bureau, which Gao claims led to her working as a prisoner in the countryside. The IJ completely ignored this highly relevant and potentially corroborative evidence, evidence beyond that which a typical refugee must present to establish a claim for asylum. See Senathirajah v. INS, 157 F.3d 210, 216 (3d Cir. 1998) (corroboration not required to establish credibility).

Determining the document's credibility is beyond the scope of our review in this instance, and is a task that must be accomplished by the fact finder. See Garrovillas v. INS, 156 F.3d 1010, 1017 (9th Cir. 1998) (On remand, BIA should consider credibility of letters they did not consider in initial evaluation); Sotto v. INS, 748 F.2d 832, 837 (3d Cir. 1984) ("If the administrative record fails to reveal that such evidence has been fairly considered, the proper course is to remand the case to the INS so that the Service may evaluate such evidence and consider its effect on the application as a whole."). Because of the high probative value of this evidence, which supports Gao's consistent testimony, reconciles ambiguities and conflicts with the suspect report cards, we conclude that it was reversible error for the IJ to fail to evaluate and discuss it.

D. Additional Adverse Credibility Determinations

The IJ, having made a credibility determination based upon the report card evidence, pointed out three other elements to Gao's story he found implausible. The IJ did not attempt to justify the foundation for this implausibility, but merely added it to his suspicions about Gao's story. The IJ did not believe the story of her escape; rather he

opined that he did not believe that security would be so lax and lenient as to allow her to escape. The IJ also found Gao

unresponsive when asked about her escape. The record, however, indicates that far from being unresponsive, Gao gave specific and detailed answers to the question, even working through the translator. She did not avoid answering the question as much as she attempted to explain her answer, as we report in the margin. 7 Having

_____

7. The exchange between Mr. Bloom of the INS and Gao is instructive:

Q. And ma'am, why did they take you out of the prison that you were in, or out of the rom [sic] that you were in?

A. Because they said since you Falungong members like to exercise, so I'm going to let you do more stuff, so they took us to a park. It's a big park and it's very dirty.

Q. And ma'am, did they have you in any handcuffs, or any kind of restraint at that time?

A. Yes. When they took us out to, to the park we were handcuffed, and however, as soon as we start working then we, then those stuffs are took off.

Q. And ma'am, you indicated then at lunch time you just simply ran away, correct?

A. (In English) Yes.

A. Yes.

Q. Didn't anyone chase you?

A. Because all of the people are, are Falungong's members, so they're really happy that I, that I could escaped.

Q. Okay. My question is, didn't any of the guards or the officers, didn't they chase you?

A. They didn't, they didn't expect that a young child like me would run away, and because at that, prior to that I was sitting with a big sister and we were talking under the tree.

Q. Okay. But my question, ma'am, again is, did the officer or the guards ever chase you?

A. Okay. We were working, we were working there counting the people, and but we were, we were eating the lunch, they didn't expect that, you know, and small child like me would run away.

Q. Okay. Ma'am, you said that once already, but my question again is, did the officers or the guards ever chase you? Did they chase you?

already made an adverse credibility determination based on his suspicion of the report cards, the IJ does not provide a foundation for his disbelief of Gao's testimony on these points, other than his own unsupported opinion as to how an authoritarian government operates, including his troubling remarks that he found "implausible . . . the preoccupation of Chinese authorities for someone who is a mere adjunct to the activity that the government is trying to stop or prevent, but that is not at all involved in it herself."8 But the State Department Report contradicts this unsupported assumption by the IJ. It seems that the

---

A. No, they did not know, so.

Q. Well, how is it that they didn't know that you were escaping?

A. Because lots of trees in the, in the park. It's not like here, so it's, it's not difficult to, to run away. [A.R. 128-29].

8. The IJ also indicates his lack of credibility is based on a "meager description" given by Gao as to what Falun Gong is. "She said it is a theory of 'truth, kindness and beauty,' and was unable to say anything more about what Falungong actually teaches."[A.R. 51]. The IJ did not attempt to compare this to an actual description of the Falun Gong. A book review, included in the record and submitted by the INS, includes this passage:

> Falun Gong combines elements of Buddhism, Taoism, and other Eastern philosophies with a strikingly Western sensibility that requires believers to do little more than simply lead conscientious lives and turn the other cheek. By 'cultivating' truth, compassion and forbearance practitioners are told they may increase their 'cultivation energy' (a measure of enlightenment)
>
> . . . .
>
> Though 'China Falun Gong' describes a set of exercises associated with the faith, Li makes clear that there are few requirements as to how often these must be performed, if at all.

[A.R. 334]. Mark Wallace, Falun Gong: What the religious leader who made China tremble has to say for himself, Salon.com, September 8, 1999 at http://www.salon.com/books/feature/1999/09/08/falun/. Gao's comments do not appear to be far from the mark. The IJ did not seem to consider that Gao's "meager description" might actually reflect the reality of the Falun Gong belief system, and is certainly consistent with this record evidence of its requirements.

21

Chinese government is actively pursuing all means by which to eradicate the Falun Gong movement, which apparently cannot function without messengers, even if they are not Falun Gong practitioners. At least on the record it does not appear that the IJ's conclusions are supported.

IV. CONCLUSION

The IJ rested his decision on a credibility determination that is not supported by substantial evidence in the record. In addition, the IJ failed to consider or discuss potentially corroborative evidence. Therefore, this case must be remanded so that the IJ can reconsider the credibility of Gao's narrative based on the entire record, including her explanations of seeming contradictions, serious evaluation of the expulsion letter, and a reconsideration of the significance of the report cards. We, therefore, grant Gao's petition for review and remand to the Board, with leave to further remand to the immigration judge, for a determination of Gao's claims for asylum and withholding of deportation without reliance on the adverse credibility finding previously made. In reaching this conclusion we do not comment on the credibility of the documents not considered, or the ultimate credibility of the report cards with regard to Gao's claims. We will leave that to the fact-finder with the understanding that any further conclusions must be supported by substantial evidence in the record.

GREENBERG, Circuit Judge, dissenting:

I dissent as I regard the application for political asylum and for withholding of deportation here as unmeritorious. As far as I am concerned, the claim essentially is predicated on the consequences attributable to Gao's school truancy. When Gao, a native and citizen of the People's Republic of China, arrived at the Los Angeles International Airport on October 31, 2000, without a valid unexpired immigrant visa or other valid entry document, she was 17 years old. Prior to leaving China she had been an 8th grade student at the Chao High School but was recruited in March 2000 by her aunt to be a paid messenger for Falun Gong, an organization with which she previously had not been associated. In her subsequent application for asylum, Gao stated that she feared persecution because of this activity. Although her application states that she "participat[ed] in the group" and feared torture for "practicing Falun Gong," see A.R. at 341 & 391, it is undisputed that she neither practiced Falun Gong, nor knows how to practice it. See id. at 115 & 148. Rather, as we have indicated, she acted as a messenger for Falun Gong. See id.

In her application, Gao stated that she had been disciplined for her March 2000 messenger activities which caused her to be "absent from class many times." Consequently, she stopped her activities on behalf of Falun Gong for a time, but then resumed her participation in May 2000. See id. at 341. However, when she testified, Gao stated that the government did not criticize her for her participation with Falun Gong until June 2000 and that her school's previous criticisms of her concerned her missing classes. See id. at 143-44. In this regard, in the fall of 1999, during the first semester of her second year in

high school, prior to her involvement with Falun Gong, Gao was absent 25 times and tardy 9 times, and during her second semester in the spring of 2000, she was absent 43 times and tardy 5 times. Id. at 169 & 172. 1

Gao testified that a classmate told the school principal that Gao participated in Falun Gong's activities and that

_____

1. In China, there are approximately 120 days in a semester. See A.R. at 116.

consequently, on June 13, 2000, she was expelled and taken to the police station. She was held for two days, scolded, teased and hit twice on her bottom with a stick. See id. at 134. Gao states that on June 16, 2000, she was taken to a park and made to cut grass. See id . at 109. Gao ran away from the park during a lunch break, and stayed with a relative for several months before beginning her trip to the United States. See id. at 109-110.

To support her application for asylum, Gao introduced her high school student transcript book that recorded her attendance from 1998 to June 2000. In addition to the absences already mentioned, the book shows that during her last semester in school, Gao had fallen to the last sixth in her class. See id. at 173. In the comments section following Gao's grades for each semester, the book repeatedly notes that Gao was absent from school because she "joins those outdoor exercise[s]." Id. at 167, 163, 164, 170 & 173. Gao stated that she practiced aerobics, dancing, jumping, skating, t'ai chi, jogging and other exercises. She testified that when her transcript book criticized her participation in "outdoor exercises" in January 1999, June 1999, and January 2000, the references were to those activities. See id. at 143-47. However, Gao asserted that when her transcript book used similar language in June 2000, criticizing her involvement in "exercises," it was referencing her participation in Falun Gong. See id. at 147. Gao also asserted that although she did not work as a messenger until March 2000, see id. at 119, her school "kind of kn[ew]" of her involvement with Falun Gong in January 2000. Id. at 149.

As I have indicated, the record shows that Gao was merely a messenger who neither practiced Falun Gong nor knew how to practice it. Moreover, it is uncontested that she missed an extraordinary amount of school over the course of four semesters due in significant part to her engagement in outdoor exercises including aerobics, dancing, and running -- activities that, as the immigration judge noted, in the context of this case, are worthy of criticism because of their interference with her schoolwork. See A.R. at 46. Gao admitted that some of her scores were failing, see id. at 118-19, and that she expressed a lack of

interest in school. See id. at 121. She acknowledged that criticism from the school policy and administration department that was referenced in her transcript in January 1999 was due to her absence from school and not Falun Gong activities. See id. at 141-42 & 164. In fact, Gao, though contending that her Falun Gong activities caused the police to arrest her, acknowledged that she was "required to attend school" and was "missing a very significant amount of school." A.R. at 122.

It should be obvious that we have here a case involving nothing more than a high school student being disciplined for engaging activities diverting her attention from her school work. While we might regard the discipline as somewhat severe, surely it was appropriate for the authorities to discipline her. Clearly, after Gao became a paid messenger for Falun Gong she frequently was working for that organization instead of attending school. The conversion of this case into a claim for political asylum and withholding of deportation is unjustified. I cannot understand how any court or agency can regard a 17-year old student who, on a wholesale basis, violates a requirement that she attend school and then is disciplined as a legitimate candidate for relief from deportation.

I find it useful to compare the facts in this case with those described in our very recent opinion in Ezeagwuna v. Ashcroft, No. 01-3294, 2002 WL 1752292, at *14 (3d Cir. July 30, 2002), in which we found that the petitioner was eligible for asylum because of past persecution on account of her political opinion and that she also was entitled to withholding of deportation. But Ezeagwuna was a serious case where the petitioner made a very strong showing. On the other hand here, in view of Gao's acknowledged misconduct, the Chinese authorities were justified in disciplining Gao without regard for the circumstance that she had been a messenger for Falun Gong.

I will not parse the record to demonstrate that there is substantial evidence supporting the immigration judge's particularized credibility determinations although I am satisfied that there is. See Balasubramanrim v. INS, 143 F.3d 157, 161 (3d Cir. 1998). Rather, I place my dissent on the fact that Gao's entire case lacks credibility. It is not

25

possible from the record to conclude that in view of Gao's acknowledged serious school truancy she would not have been disciplined even if she had not been associated with Falun Gong. As far as I can see Gao is using her association with Falun Gong as a cover for her truancy. Finally, I point out that we very recently noted that the events of September 11, 2001, emphasized the heightened need to conduct border searches. See Bradley v. United States, No. 01-4103, 2002 WL 1723779, at *2 (3d Cir. July 25, 2002). Those tragic events also should demonstrate that

the immigration laws should not be applied so that unworthy applicants receive relief from deportation.

I dissent as I am satisfied that we should dismiss this petition for review.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit