

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-13-2005

# Bella v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-3889

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Bella v. Atty Gen USA" (2005). *2005 Decisions.* Paper 122.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/122

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-3889

———

MARTIN MAHN BELLA

Petitioner

v.

\* ALBERTO GONZALES, ATTORNEY GENERAL OF THE UNITED STATES

Respondent

\* Substituted pursuant to Fed. R. App. P. 43(c).

———

On Petition for Review of an Order of the
United States Department of Justice
Board of Immigration Appeals
(BIA No. A78-495-290)

———

Submitted Pursuant to Third Circuit LAR 34.1(a)
December 6, 2005

Before: RENDELL, FISHER, and VAN ANTWERPEN, Circuit Judges.

(Filed December 13, 2005)

———

OPINION OF THE COURT

———

VAN ANTWERPEN, Circuit Judge.

Petitioner Martin Bella, a native and citizen of Liberia, seeks review of the decision

of the Board of Immigration Appeals ("BIA") affirming the denial by the Immigration Judge ("IJ") of his application for asylum, withholding of removal, protection under the Convention Against Torture ("CAT"), and voluntary departure. The BIA had jurisdiction pursuant to 8 C.F.R. § 1003.1. This Court has jurisdiction over the petition for review pursuant to 8 U.S.C. § 1252(a)(1). For the reasons set forth below, we will grant the petition for review and remand the case for rehearing.

## I.

Because we write solely for the benefit of the parties, we state the facts only as they pertain to our analysis. Where the IJ's adverse credibility determinations rely on specific facts, they will be set forth in turn in the relevant analysis.

Martin Bella, a native and citizen of Liberia, entered the United States in New York City on July 11, 2000, using a B-2 visitor visa issued for the purpose of attending a religious conference. Bella overstayed his visa and filed an application for asylum a year later on July 10, 2001. Bella conceded removability and appeared before the IJ on November 14, 2002, for a hearing. Bella testified that while a student at the University of Liberia, he was a member and leader of various student political parties which publicly opposed the government of Charles Taylor. As a result of these actions, Bella alleged that he was threatened, imprisoned, beaten several times, and tortured. Bella's family also allegedly suffered persecution: his brother, a member of the armed forces, was beheaded by other soldiers; his uncle, also a soldier, was killed on Charles Taylor's orders; and another of

2

Bella's brothers was mistakenly arrested by soldiers who believed he was Bella.

In an oral decision dated January 13, 2003, the IJ denied Bella's applications for asylum, withholding of removal, protection under the CAT, and voluntary departure. The IJ made over a dozen adverse credibility findings based on alleged discrepancies between Bella's testimony and his written affidavit, as well as an overall demeanor finding. The IJ rested his decision solely on his credibility determinations, and did not address the merits of Bella's claim of past persecution or his alternative claim of a well-founded fear of future persecution. To his credit the IJ did, we note, correctly state the law applicable to asylum, withholding, and CAT claims. Bella timely filed an appeal with the BIA, challenging the IJ's credibility determination as unsupported by substantial evidence. The BIA dismissed his appeal in an Order dated September 3, 2004. In affirming, the BIA relied solely on but one of the IJ's adverse credibility findings – regarding the correct name of Bella's deceased brother – and accorded complete deference to the IJ's demeanor finding. Bella then filed this timely petition for review, along with a motion to stay deportation. On December 22, 2004, a panel of this Court granted that motion.

## II.

Bella challenges the IJ's adverse credibility determination as unsupported by substantial evidence. Where the BIA substantially uses the IJ's findings, but also makes findings of its own, we review both decisions. Xie v. Ashcroft, 359 F.3d 239, 242 (3d Cir. 2004). Findings of fact, including adverse credibility determinations, are reviewed under the

3

substantial evidence standard. 8 U.S.C. § 1252(b)(4)(B); see also Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002). Such determinations are upheld unless a "reasonable adjudicator would be compelled to conclude to the contrary," considering the totality of the circumstances. Gao, 299 F.3d at 272 (quoting 8 U.S.C. § 1252(b)(4)(B)). "Adverse credibility determinations based on speculation or conjecture, rather than on evidence in the record, are reversible." Id.

## III.

Bella has the burden to prove, through credible evidence, either past persecution or a well-founded fear of future persecution on account of a statutorily protected ground, including, *inter alia*, religion, social group membership, or political opinion. 8 U.S.C. § 1101(a)(42)(A). Upon proving past persecution, Bella is "presumed to have a well-founded fear of persecution on the basis of the original claim." 8 C.F.R. § 208.13(b)(1). This presumption can be rebutted by evidence of changed country circumstances or ability to relocate to a different part of Liberia. 8 C.F.R. § 208.13(b)(1)(I). The IJ's adverse credibility determination must involve the "heart of the asylum claim." Gao, 299 F.3d at 272.[1]

An IJ "must state a reason and detail with specificity the issues of non-credibility." Id. at 275. Conclusions must be based on "specific, cogent reason[s]." Dia v. Ashcroft, 353

---

[1]Bella's asylum claim was submitted in 2001, well before the effective date of the Real ID Act, and therefore is not subject to a new provision allowing an IJ to rely on inconsistencies "without regard" to whether they go to the heart of the asylum claim. Real ID Act of 2005, § 101(a)(3), Pub. L. No. 109-13, 119 Stat. 231, 303, *codified at* 8 U.S.C. § 1158(b)(1)(B)(iii).

4

F.3d 228, 250 (3d Cir. 2003). We have "cautioned against placing too much weight on inconsistencies between an asylum affidavit and subsequent testimony." Zubeda v. Ashcroft, 333 F.3d 463, 476 (3d Cir. 2003).

Here, the IJ identified over a dozen areas of testimony which, he asserted, supported his adverse credibility determination against Bella. The BIA, on appeal, appears to have rested on only two of these: 1) Bella's confusion of his brother's name with his cousin's; and 2) the IJ's finding that Bella's demeanor was that of an "actor reciting his rehearsed lines," in that he allegedly adhered very closely to his affidavit. Because we must review both orders, we will address all of the findings in turn, but with special attention to the two relied upon by the BIA.

For the reasons set forth below, we conclude that the IJ paid insufficient attention to the record, ignored submitted evidence and physical burns, and selectively used Bella's testimony in making the adverse credibility determination.[2] Many inconsistencies did not go

---

[2] While Bella did not bring a Due Process challenge, we take this opportunity to note several troubling aspects of his hearing. The IJ often jumped in and prevented Bella's counsel from continuing with his direct examination, and then prohibited counsel from re-questioning on those subjects. See, e.g., Appendix at *26; id. at *34-35; id. at *41; id. at *36 (Judge: "Would counsel – don't interpret me please."); id. at *52 (preventing counsel from asking a question to clarify Bella's answer to an IJ question). The IJ also frequently took over the INS's *cross-examination* of Bella. Appendix at *82-84; id. at *95; id. at *108. Without admitting a newspaper article into evidence, the IJ proceeded to question – without any support from the record or country conditions – the article's veracity. See Appendix at *25; id. at *116-119. Most troubling, after chastising Bella's counsel for allegedly leading Bella – by asking merely whether a Liberian phrase had meaning to him, Appendix at *48-49 – the IJ stated in the middle of his hearing that "the testimony his [Bella's] testimony is worthless." Appendix at *51.

5

to the "heart" of Bella's claim of past persecution which, if proven, absent the adverse credibility determination would have entitled him to a presumption of fear of future persecution. After a review of the record, for these reasons we cannot say that the IJ's adverse credibility finding was supported by substantial evidence; we are "compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

## A. Bella's Uncle

Bella testified that after learning of the murder of his brother, he fled to live with his uncle, Cooper Teah, a soldier in Charles Taylor's army who was later killed by other soldiers on Taylor's orders. The IJ found a "contradiction" because Bella testified that Teah was his mother's brother, while in his affidavit he allegedly stated that Teah was his father's brother. IJ Order at *6. The IJ misread Bella's affidavit and ignored record evidence. Specifically, the IJ ignored a second, corrected affidavit, which was explicitly presented to the IJ and submitted into evidence, Appendix at *7-8, which amended Bella's affidavit to reflect the fact that Teah was his mother's brother. Bella's testimony was completely consistent with this corrected affidavit. The IJ's claimed contradiction is based only on the first, uncorrected affidavit, and did not ever acknowledge in findings that a corrected affidavit existed and cleared up the issue. Review of the record thus confirms that there was no inconsistency upon which the IJ could rely.

## B. Detention with Jack the Rebel

Bella testified that in one of the many times he was arrested and detained he was

6

arrested at a checkpoint and taken to a building to be interrogated and tortured by George Duanah, a former college acquaintance now known as Jack the Rebel. Appendix at *59-62. Bella alleged he was held for two weeks, interrogated, and tortured. Specifically, he alleged he was burned, and he showed the IJ supporting scars – which the IJ failed to mention in his findings. Appendix at *61-65. At the end of the two weeks, a member of the army who had been a friend of Cooper Teah convinced Bella's captors to release him to her for further investigation. She then released him completely after several days. Appendix at *66-68.

The IJ made several adverse credibility determinations as a result of this testimony. First, the IJ found that Bella's testimony about where he was held differed from his affidavit. Bella's affidavit stated that he was taken to "jail." Affidavit at ¶ 17. According to the IJ, Bella testified that he was taken instead to an abandoned building. IJ Order at *7. An inspection of the transcript of the hearing, however, reveals that the IJ cut off Bella's attempted response to the question, and then completely ignored Bella's actual answer.

> Question (Counsel): Where is it that they took you in Congo Town?
> Answer (Bella): Congo Town it was an abandoned building *that they were using as* –
> Question (Judge): Burned out building?
> . . .
> Question (Judge): Abandoned building?
> Answer (Bella): Yeah. They were using that as some headquarter and *detention center*, and I was taken there.

Appendix at *61 (emphases added). Bella's testimony about a detention center differs in no material way from his affidavit, as the IJ could have plainly heard from the testimony itself, and seen upon review of the transcript. There was no inconsistency.

7

Next, the IJ made an adverse credibility finding based on supposed inconsistencies in Bella's story regarding how long he was kept without food and water. IJ Order at *8. According to the IJ, Bella testified that he was held for two weeks without food or water, but had said in his affidavit that he was given water after five days. Id. Bella's affidavit stated that he was "given his own urine to drink several times"; around the fifth day, he was given water, and fed at some point in the second week. Affidavit at ¶ 18. The transcript shows that Bella testified that he was given his urine to drink, and "about five days there was no food." Appendix at *65. Bella's testimony did not explicitly contradict his affidavit regarding how long he went without water, given that it did not mention a time duration. After review of the record, we cannot find a material inconsistency on which the IJ could rely.

Third, the IJ found it "implausible" that another member of the army could have obtained Bella's release to her control. IJ Order at *8. Here, the IJ did not find any inconsistencies in Bella's testimony on this point, nor could he have given the record. The IJ supplied no reasons why he found this averment and testimony implausible, beyond stating that Bella was "well known to be against the Charles Taylor government and was an individual that the Taylor government wished to keep control over." Id. This determination was "not made against the background of the general country conditions," Dia, 353 F.3d at 249, nor was it grounded in the record. "By requiring the IJ to tether a plausibility determination to evidence in the record, including evidence of country conditions or other contextual features, and rejecting speculative or conjectural reasoning, we ensure that there

8

is a reasoned foundation to support the conclusion that the witness's testimony was objectively implausible." Jishiashvili v. Att'y Gen. of the United States, 402 F.3d 386, 393 (3d Cir. 2005).

Further, nowhere in his Order did the IJ discuss the content of the submitted country reports and numerous Liberian newspaper articles. The IJ made no findings on why, in light of the chaotic conditions in Liberia at the time, it would be implausible for a prisoner merely to be transferred from one group of soldiers *to another soldier in the same army*. At the same time, the IJ did not express any doubt about the many other times Bella testified and averred that he had been arrested, then released with little or no explanation after being held for days. In light of these other incidents, the IJ's unsupported fixation on the alleged implausibility of an intra-army transfer can only be based on "speculation or conjecture." Gao, 299 F.2d at 272.

Fourth, the IJ found an inconsistency regarding how long Bella stayed at a friend's house after being released by his uncle's army friend. Bella's affidavit stated that he left his friend's house at the "end of December." Affidavit at ¶ 21. According to the IJ, Bella testified that he stayed for only one and a half months, which according to the IJ's calculations, meant he left in mid-November. IJ Order at *8. In so reasoning, the IJ wholly ignored Bella's testimony:

> Question (Counsel): How long a period of time?
> Answer (Bella): I stay there pretty close to a month and a half *or more*.
> Question (Counsel): Okay. So at some time you left?
> Answer (Bella): I left yes *in December* . . . .

Appendix at *69 (emphases added). Bella indicated that he spent *at least* a month and a half at his friend's house, and that he left in December–each of which is fully consistent with his affidavit. Plainly, there was no inconsistency here.

Finally, we must again observe that despite fixating on so many supposed inconsistencies in Bella's account of his captivity, the IJ shockingly failed to mention in his findings that, after Bella stated in his affidavit that he was burned on his "left elbow and right shin," Affidavit at ¶ 19, Bella *showed* the IJ, on the record in open court, scars on his left elbow and right shin. Appendix at *63-64. During the hearing the IJ failed to raise any doubt as to the scars' origin or identity as burn wounds. Id. We do not see how the IJ could have utterly ignored this extremely credibly corroborative evidence while quibbling over dates.

### C. Honorary Degree Protest

Bella testified that in 1999, the Student Unification Party – of which he was a leader – found out that the University was planning on conferring an honorary degree on Charles Taylor. Appendix at *70. The party told the university that it opposed the plan. Two days later, Bella alleged he was beaten by several men in a car. Appendix at *70-71. The IJ found it incredible that "after escaping from jail this respondent would expose himself again to being arrested by participating in a protest." IJ Order at *9. Here again, this finding mischaracterizes, and is otherwise unsupported by, the record. To the extent the IJ stated that, after a person is arrested once, any future public appearances which result in arrests or

10

beatings are necessarily fictitious on the theory that no one, regardless of how strong they feel about their political or religious beliefs, would risk being arrested again, such statements are improper speculation. The IJ cites no record evidence, nor any evidence regarding country conditions, to support his assumption. Moreover, the IJ mischaracterizes the record, which in no way shows that Bella "escap[ed]" from jail. To the contrary, Bella testified that he was transferred from one group of army personnel to another. See supra Part III.B. The IJ also failed to mention Bella's plausible explanation of why he would continue to protest the Taylor government despite his past arrests. Bella testified that "[o]nce you are part of a group that became opposition to Mr. Taylor . . . you became a target. . . . [O]nce I was involved for the first time in anything critical of the government they came after you." Appendix at *74-75. The IJ failed to cite anything in the record to support his speculation that political dissidents in Liberia would go into permanent hiding after an arrest.

Next, the IJ found it not credible that Bella would only have been beaten instead of rearrested after he had "escaped from custody." IJ Order at *9. This finding is also unsupported by the record evidence. Bella testified only that he was beaten by "men [who] came out of a car." Appendix at *71. The IJ alone appears to have jumped to the conclusion that these men were police and were aware of something more than that Bella was involved in a protest. This was improper speculation. As noted above, the IJ also again mischaracterizes the record by concluding that Bella "escaped" from jail. We find that neither of the IJ's conclusions and speculations regarding this incident were supported by the

11

record.

### D. Bella's Business Activities

The IJ next found it incredible that Bella would have helped to run two businesses "in an open fashion" instead of "stay[ing] in hiding and not ventur[ing] into public venues." IJ Order at *10. The IJ also noted several variations in Bella's account of the dates during which he operated the businesses. IJ Order at *9. We have the same problem with these conclusions as those above regarding the IJ's discrediting of testimony of Bella's beating after a protest. See supra Part III.C. The IJ cites absolutely no record evidence to support his conclusion, and ignores record evidence to the contrary. In any event, regarding any date variations, we fail to see how these minor discrepancies regarding businesses – which Bella's *wife* primarily ran – can possibly go to the heart of Bella's claim. "Minor inconsistencies in the record such as discrepancies in dates which reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding." Senathirajah v. INS, 157 F.3d 210, 221 (3d Cir. 1998) (quoting Vilorio-Lopez v. INS, 852 F.2d 1137, 1141 (9th Cir. 1988)).

### E. Allegedly Murdered Brother

Bella testified that many of his family members had been killed while in Liberia. He testified that one of his brothers had been killed by other soldiers while in the army, and that his brother's beheaded body, along with the bodies of others, were found in the street sometime in May, 1990. Bella also testified, and averred in his affidavit, that two of his

cousins, named Thomas and Moses, had been killed.  Affidavit at ¶ 9.

The IJ faulted Bella for allegedly not including his deceased brother in his asylum application.  IJ Order at *5.  However, the IJ explicitly stated that he was only looking at the question which asked for Bella's political associations, as well as those of his family.  Id. In so doing, the IJ ignored Bella's answer to the very next application question, which asked Bella whether he or "any member of [his] family [had] ever been mistreated or threatened by the authorities" of Liberia.  Bella responded in the affirmative, and referred the reader to the "accompanying Affidavit for specific incidents, Circumstances, dates, locations, etc." Asylum App. at *5.  The attached affidavit clearly described Beh's death at Affidavit ¶ 6. Bella's undisputed placement of his answer in a properly attached affidavit cannot be a valid basis for an adverse credibility finding.

Bella's affidavit identified his murdered brother as Beh.  Affidavit at ¶ 6. In his direct testimony, Bella named Thomas as his brother, then corrected himself when the error was brought to his attention by his counsel.  Appendix at *18.  On these facts, the IJ found it "absolutely incredible and absolutely implausible . . . that the respondent would forget his brother's name."  IJ Order at *5.  The BIA subsequently affirmed, finding that Bella had not sufficiently explained his mistake.

The record supports neither conclusion.  Instead, it shows that the IJ repeatedly cut Bella off when he attempted to point out, consistent with his affidavit and asylum application, that he had a cousin named Thomas who had *also* been killed.  See, e.g.,

13

Appendix at *19-20; id. at *78-79. Ignoring the record evidence that Bella did have a *cousin* named Thomas, the IJ fixated on the fact that Bella had no *brother* named Thomas, Appendix at *20 – even though Bella had plainly and consistently averred and testified that *both* had been killed for statutorily relevant reasons. Under these circumstances, we fail to see how the IJ and BIA may criticize Bella for failing to explain his mistake, while simultaneously preventing him from giving that explanation and ignoring the record evidence explaining the mistake. We also find that the inconsistency cannot be said to go to the "heart" of Bella's claim of past persecution which, if proven, would entitle him to a presumption of a well-founded fear of future persecution.

### F. Demeanor Finding

The IJ concluded with a finding that Bella's demeanor was "more like an actor reciting his rehearsed lines than that of a witness testifying from memory. The respondent's testimony was almost a word for word reflection of his affidavit with practically no deviation from the written word." IJ Order at *10-11. The IJ also stated that Bella was "rambling on reciting the contents of his affidavit." IJ Order at *11. As we have noted in the past, the IJ was entitled to rely on demeanor in making an adverse credibility finding. See, e.g., Dia, 353 F.3d at 252 & n.23. The BIA accorded complete deference to this finding without inquiry into its record support. However, the IJ cannot insulate a "demeanor" finding from review without supporting it with reasons grounded in the record, which the IJ made no attempt to do here. IJ Order at *10-11. More fundamentally, the IJ simultaneously faults Bella for

14

testifying contrary to his written affidavit in a dozen ways, yet made a contradictory "demeanor" finding that Bella failed to deviate enough from that same affidavit. Both cannot be true.

Examination of Bella's testimony shows that he testified consistently with his affidavit. He elaborated on matters in the affidavit to explain their context, and as such can hardly be said to have repeated it word for word in all respects. Bella can scarcely be faulted for remembering details of inherently memorable events – specifically a physical *threat* made to him – in the same words between his affidavit and testimony. See Appendix at *43-45. Similarly, where the IJ criticized Bella for "rambling," the record instead shows that the IJ repeatedly cut off Bella's attempts to explain, *consistent with his affidavit*, the *background* of his political affiliations and the *background* of various protests that led to persecution events. See, e.g., Appendix at *41 (Judge: "Rather than going on and on, and on about facts that don't really concern me . . . ."); c.f. Iliev v. INS, 127 F.3d 638 (7th Cir. 1997) (describing the type of conduct by an IJ which might lead to the denial of a full and fair hearing). Where the IJ insisted on taking over Bella's counsel's questioning and limited Bella to yes or no answers, see, e.g., Appendix at *41-42, and further prevented Bella from elaborating on the affidavit, we fail to see how the IJ can also criticize Bella for adhering too closely to his affidavit.

IV.

In sum, the IJ relied solely on his adverse credibility finding in denying Bella's claims

15

for asylum and withholding of removal, as did the BIA in dismissing Bella's appeal. For the foregoing reasons, we conclude that these adverse credibility determinations were not supported by substantial evidence.[3] While the IJ correctly stated the law of asylum, withholding, and CAT protection, the IJ did not reach those points of law. We will grant the petition for review, vacate the IJ and BIA's Orders in full and remand this case for rehearing. Finally, we note that the IJ failed to give any indication that his denial of Bella's CAT claim was based on anything other than his adverse credibility determination. This was error, as "credibility for purposes of establishing . . . asylum and withholding of deportation claims does not defeat [an alien's] ability to meet [his] burden of proof under the Convention Against Torture." Zubeda, 333 F.3d at 476 (quotation marks omitted). Bella did present evidence of torture at the hands of the Liberian government, which should be considered on remand.

We have considered all other arguments made by the parties on appeal, and conclude that they do not cause us to change our decision to remand.

---

[3]We merely conclude that the IJ's adverse credibility determinations were not supported by substantial evidence. We do not reach the question of whether Bella was credible or should be entitled to any of the relief sought. These are questions for remand. Cao v. Att'y Gen. of the United States, 407 F.3d 146, 161 n.4 (3d Cir. 2005).