

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-12-2005

# Caou v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-4256

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Caou v. Atty Gen USA" (2005). *2005 Decisions.* Paper 1099.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1099

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————

No. 03-4256

————

YUN JUN CAO

<u>Petitioner</u>

v.

ATTORNEY GENERAL
OF THE UNITED STATES OF AMERICA,

<u>Respondent</u>

————

On Petition for Review of Order of the
Board of Immigration Appeals
(Board No. A79 309 920)

————

Argued November 18, 2004
Before: ROTH, SMITH, and BECKER, *Circuit Judges*.

(Filed:  May 12, 2005)

NORMAN KWAI WING WONG (argued)
401 Broadway, Suite 1205
New York, NY 10013
        *Attorney for Petitioner*

PETER D. KEISLER
JOHN C. CUNNINGHAM
MICHELLE R. THRESHER
JEFFREY M. SENGER (argued)

Office of Immigration Litigation
United States Department of Justice
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
   *Attorneys for Respondent*

———

OPINION OF THE COURT

———

BECKER, *Circuit Judge*.

Yun Jun Cao, a Chinese national, petitions for review of the denial by the Board of Immigration Appeals (BIA) of her application for asylum and withholding of removal and for protection under the Convention Against Torture (CAT). Cao claims that, while working as a pediatrician in a Chinese hospital, she discovered that the hospital was committing infanticide in an attempt to comply with China's population control policy. After her letter to a Hong Kong news reporter exposing this practice was intercepted by the Chinese government, she says that she was detained for three months, interrogated, and physically abused. Upon release from prison, Cao fled China and arrived in the United States on a visitor's visa.

Cao's allegations that she was persecuted for exposing and criticizing the practice of infanticide, if credible, would be sufficient to establish a valid asylum claim under the amended 8 U.S.C. § 1101(a)(42)(2005). The Immigration Judge (IJ), however, denied Cao's claim for relief on the basis of an adverse credibility determination. After declaring that Cao's demeanor as a witness was "quite perfect," the IJ discredited virtually every aspect of Cao's testimony. With respect to the infanticide issue, the IJ proceeded on the basis of the notion that there is no real distinction between infanticide and forced abortion, which led her to be incredulous that Cao could be so offended by infanticide when she was already aware of the practice of forced abortion. The IJ made no attempt to anchor this aspect of her credibility finding to the record. Additionally, the IJ found a lack of credibility with respect

2

to a number of other aspects of Cao's testimony, each of which turn out to be either based on speculation or without any support in the record. The IJ thus improperly discredited Cao's testimony in a number of material respects.

The BIA summarily affirmed the IJ's decision without opinion. Thus, we review the IJ's decision alone. Because the IJ's determination does not meet the substantial evidence standard under which the decision must be reviewed, *see infra* Part II, we will grant Cao's petition for review and remand to the BIA for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

Cao attended the Gaungxi Province College of Traditional Chinese Medicine and then practiced as a pediatrician at the Second Affiliated Hospital of Guangxi Province in the city of Nanning. She is married and has a daughter, and both her husband and daughter remain in Nanning at this time. The following is Cao's testimony about the events beginning in 1999.

In that year, after fifteen years of medical practice, Cao discovered that her hospital was killing live born babies who were born in violation of China's population control policy, described in the margin.[1] Although she had been aware of China's family planning policy and had previously known that officials would at times force women to have late-term abortions in which the fetus

---

1 In 1979, the Chinese government first instituted a comprehensive family planning policy which established quotas on the number of children permitted for each couple. The policy has changed over time, relying in varying degrees on education, economic incentives, propaganda, and coercive measures to ensure compliance. *See* U.S. State Department, *China: Profile of Asylum Claims and Country Conditions* 20 (1998) [hereinafter 1998 China Profile]. While the government officially denies that physical force is used to compel abortion or sterilization, there are widespread reports that such coerced procedures nevertheless occur. *Id.* Neither the Chinese government nor the U.S. State Department has officially recognized the use of infanticide as part of China's population control policy.

was terminated before exiting the birth canal, Cao did not know that the hospital was committing infanticide until 1999.

Cao realized that the hospital was committing infanticide only after her Pediatrics department moved to the same floor as the Obstetrics/Gynecology (Ob/Gyn) department due to hospital renovations. One day, she noticed a woman crying in the Obstetrics ward and was told that the woman's child had died suddenly after she had given birth. Cao's suspicions were raised because the obstetricians had not consulted with the Pediatrics department. An Ob/Gyn nurse told Cao, "never mind about that, that was business for family planning policy."

After this incident, Cao began to notice other women crying, each of whom claimed her baby had died shortly after birth. She finally confronted Lao Zi Juan, a friend from medical school, who worked in the Ob/Gyn department, about the infant deaths. Lao Zi told her that the mothers did not have family-planning permits, and so, under the hospital rules, nurses would inject newborn babies with alcohol to cause death. Cao claims that she was shocked to learn that the hospital was killing children born alive to comply with the population control policy.

According to Cao, a few months later, at a party in a friend's home, she encountered Suen Yut, a reporter for the Hong Kong magazine, *Cheng Ming Monthly*. In the course of their conversation, Suen Yut asked Cao if she had heard that infanticide took place at Chinese hospitals. Cao told him what she had witnessed at her hospital. Suen Yut asked Cao to write a detailed account about the practice of infanticide and send it to him so that he could write an article exposing the practice. While hesitant at first because she was worried about losing her job, Cao eventually agreed to send the information to Suen Yut after he assured her that the article could be published anonymously.

Because she was concerned about using the mail for sending such sensitive information, Cao first mailed Suen Yut a test letter, containing nothing controversial. This letter reached him without being intercepted. She then mailed a second letter detailing what she had observed about the practice of infanticide. This letter was sent by registered mail, which required her to give her name. The letter, however, was intercepted by the Chinese authorities and traced back to Cao.

As a result, Cao was arrested at her home in Nanning on

4

April 25, 2000.  She says that the authorities then gave her husband a notice of detention, which she submitted in evidence at the proceeding before the IJ.  She claims that, after her arrest, she was detained, interrogated, and beaten.  The officers presented her with the letter to Suen Yut and she eventually confessed that she had written it.  She testified that the interrogations included beatings and electric shocks, and that she continues to have recurring pain in her shoulder, neck, and fingers as a result.  At her hearing before the IJ, Cao testified that she thought her interrogators were public security officials,  although they were not always in uniform.  In her asylum application, Cao had said she was tortured by fellow inmates, at the officer's instigation, but she did not mention this fact in her oral testimony.

Cao was not charged with any crime, but the security officers told her that she could be charged with sedition and sentenced to ten years imprisonment.  Cao testified  that she was detained for three months and was conditionally released on July 25, 2000.  She says that the officials released her so they could use her to lure Suen Yut back to mainland China.  On release, she had to post bail and report to public security every week, but she believes that she remained under surveillance.  On July 26, 2000, she received notice that her employment with the hospital had been terminated.

After her release, Cao managed to send word to Suen Yut through a friend who was visiting Hong Kong, warning him not to contact her or to come to Nanning.  The friend mailed the warning letter from Hong Kong.  Suen Yut apparently did not  return to mainland China and was not apprehended by Chinese officials.

On October 16, 2000, Cao made her last weekly report to public security.  That afternoon, she absconded from Nanning and went to the Shanghai airport, where she bribed a relative of a friend with "30,000" to provide her with an exit permit.[2]  Though her house had been searched after her arrest and again after her release, the public security officers did not find her passport, which was stored in a safe deposit box at a bank.  Cao boarded a plane in Shanghai, and arrived in the United States on a B-1 visa on

2 The record does not make clear whether the amount of the bribe is measured in yuan or U.S. Dollars.

5

October 20, 2000. In filling out her temporary visa application, Cao lied about the purpose of her visit to the United States, and falsely stated that she had never been arrested, and that she was still employed at the hospital. Cao admitted these falsehoods at her hearing before the IJ.

Cao was authorized to remain in the United States only as a temporary visitor. After she overstayed her visa, she was interviewed by an asylum officer who referred her claim to an Immigration Judge. On October 26, 2001, Cao was served with a Notice to Appear charging her with removability pursuant to Section 237(a)(1)(B) of the Immigration and Nationality Act. Cao conceded removability and requested asylum, withholding of removal, and protection under the Convention Against Torture.

In addition to testifying to the aforementioned facts, Cao introduced documentary evidence to corroborate her story. She submitted her passport and hospital identification card. She offered a letter from her husband in China to Cao at her address in New Jersey. The letter relates that after Cao escaped to the United States, the public security officers came to Cao's house in China to search for her and "harassed" her husband and daughter, confiscated letters, and threatened them with a gun. When the officers found nothing, her husband said the public security officers "request[ed] me to notify you to return back to China to surrender yourself and accept the punishment by law. Otherwise we would face more serious punishment . . . if you were arrested or if you were sent back to China some day."

In addition, she offered a document, which she claims was given to her family upon her arrest by the Nanning City National Security Bureau, which states that she was arrested and jailed for "contribut[ing a] reactionary article for overseas publication." Further, Cao introduced her dismissal letter from the Gaungxi College of Traditional Chinese Medicine, which denounced her as being "poisoned by Capitalistic anarchism for [a] long time. She has [an] intimate[] relationship with overseas anti-China forces and post[ed a] contribution . . . outside of China to make vicious attack against the national basic policy of China."

When asked by the IJ how she received these documents, Cao explained that she had asked her family to send evidence supporting her asylum claim, and that her husband had a friend mail his letter and the other documents from Guangzhou province.

6

Cao testified that she did not retain the envelope, but that the package did not appear to have been opened when she received it in the United States.

Finally, Cao provided a letter, dated July 31, 2001, which she claims is from the reporter Suen Yut at the *Cheng Ming Monthly* in Hong Kong. The letter states in the first paragraph that

> [Cao] suffered arrest, imprisonment and torture because she provided me the news clues, in which she reviewed the fact[] that [the] Chinese government kill[s] infants by medical means in nationality autonomous regions for the purpose of population control. She therefore escaped to your country to avoid further persecution.

The letter goes on to discuss more generally human rights abuses in China and other unrelated instances of China's restriction of free speech and other civil liberties.

The IJ issued a lengthy decision denying Cao's asylum, withholding of removal, and CAT claims on the ground that Cao was not credible. The IJ justified her adverse credibility determination on several purported inconsistencies and implausibilities in Cao's story. Because this credibility determination goes to the heart of Cao's claim on appeal, we will discuss the substance of the IJ's findings below.

Cao appealed to the Board of Immigration Appeals, which affirmed the IJ without opinion pursuant to the streamlining regulations, 8 C.F.R. § 1003.1(e)(4). She timely petitioned for review.

## II. JURISDICTION, SCOPE AND STANDARD OF REVIEW

This Court has jurisdiction to review final orders of removal under 8 U.S.C. § 1252(a)(1). Because the BIA affirmed the IJ without opinion, this Court reviews the IJ's opinion alone. *See Dia v. Ashcroft*, 353 F.3d 228, 245 (3d Cir. 2003) (en banc). We review the IJ's opinion under the "substantial evidence" test, set forth in 8 U.S.C. § 1252(b)(4)(B): "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *See also Abdille v.*

7

*Ashcroft*, 242 F.3d 477, 483-84 (3d Cir. 2001) (agency's finding "must be upheld unless the evidence not only supports a contrary conclusion, but compels it."). Under this standard, "[T]he Court will uphold the agency's findings of fact to the extent that they are 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002) (citations omitted).

The credibility determination, like all IJ factual findings, is subject to substantial evidence review. *Abdulrahman v. Ashcroft*, 330 F.3d 587, 597 (3d Cir. 2003). Adverse credibility determinations may be based on "inconsistent statements, contradictory evidence, and inherently improbable testimony." *Dia*, 353 F.3d at 249. While the standard of review is deferential, this Court still must exercise meaningful review of the IJ's decision:

> Adverse credibility findings are afforded substantial deference so long as the findings are supported by specific cogent reasons. The reasons must be substantial and bear a legitimate nexus to the finding.

*Gao*, 299 F.3d at 276 (citations omitted).

## III. DISCUSSION

### A. *The Legal Standard*

The Attorney General may grant asylum to an alien who is a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42). *See* 8 U.S.C. § 1158(b)(1). To be eligible for asylum, an alien must show that he or she:

> is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of [the country of such person's nationality or in which such a person last habitually resided] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. . . .

8

8 U.S.C. § 1101(a)(42)(A). A showing of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1). While asylum constitutes discretionary relief, an asylum applicant is entitled to withholding of removal if he or she can satisfy the higher burden of demonstrating that it is more likely than not that life or freedom would be threatened because of a protected ground if he or she were removed. 8 U.S.C. § 1231(b)(3)(A) (1999); *Miah v. Ashcroft*, 346 F.3d 434, 439 (3d Cir. 2003).

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996), amended § 1101(a)(42) to specify, *inter alia*, that individuals persecuted for resistance to a coercive population control program "shall be deemed to have been persecuted on account of political opinion," and thus are eligible for asylum.[3] Cao has alleged that she was persecuted for exposing and criticizing the practice of infanticide committed as part of China's population control policy. If credible, Cao's allegations would qualify her for asylum under the amended 8 U.S.C. § 1101(a)(42), as constituting "other resistance" to China's population control policy.

There is little precedent defining the scope of the population control portion of Section 1101(a)(42)'s protections in cases where the applicant does not claim he or she was personally subjected to

---

3Section 1101(a)(42) provides, in relevant part:

[A] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

forced abortion or sterilization. Nevertheless, the statute plainly specifies that a person who engages in "other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion." It appears to us that writing an article critical of population control practices and exposing the practice of infanticide constitutes such "other resistance." At all events, even if we did not hold that the population control provision specifically applied, it is clear that Cao's allegations of detention and physical abuse for exposing and criticizing a government practice would be encompassed in the more general asylum protections for those who have been persecuted on account of political opinion. *See Grava v. INS*, 205 F.3d 1177, 1181 (9th Cir. 2000) ("[W]here the whistle blows against corrupt government officials, it may constitute political activity sufficient to form the basis of persecution on account of political opinion."); *Marquez v. INS,* 105 F.3d 374, 381 (7th Cir. 1997) (noting that "political agitation against state corruption" could be considered grounds for asylum).

Therefore, as Cao's allegations would be sufficient to make out an asylum claim, Cao's ability to seek relief hinges on the credibility determination.

B. *Review of the IJ's Credibility Determination*

1. Abortion and Infanticide

Cao testified that when she discovered infanticide was occurring in her hospital she was "shocked" and grew "despondent" to find that "they would kill [a] baby like that." Cao said that she had known that forced abortions, even late term abortions, had occurred, but that she did not know until her Pediatrics department was moved to the same floor as the Ob/Gyn ward that nurses were killing live infants after delivery. The IJ, however, was troubled that Cao would distinguish between infanticide and forced abortions. The IJ stated:

[Cao] seemed to make [a] very distasteful distinction that she believes that the saline abortions, in her opinion, were less offensive than the infanticide that was being performed on live born children. In other words, she seems

10

to make a distinction in her own peculiar mind that a saline abortion that kills the fetus before it exits the birth canal is somehow distinguishable from the infanticide or forced death of the child born alive.

Later in her opinion, the IJ again expressed discomfort that Cao would make such a distinction, "How somebody can . . . mak[e] a distinction between saline abortions and others is really disturbing." The IJ's view that the two procedures should be deemed equally offensive or functionally equivalent led her to discredit Cao's professed "shock" at discovering that infanticide occurred, because Cao had admitted that she was previously aware that forced abortions had occurred at the hospital. Since the IJ equated abortion and infanticide, she could not believe that Cao would be shocked to discover *infanticide* was occurring since "this concept of *forced abortion* is nothing new to anybody" (emphasis added). The IJ continued by adding that "[Cao] eventually admitted that she knew that all the hospitals in China were probably performing forced abortions, despite the fact that she went into sudden shock in 1999 just because one of the methods was different from all the rest."

Because the IJ herself did not distinguish between abortion and infanticide, she seemed unwilling to believe that Cao would make such a distinction. She thus discounted Cao's testimony that she was surprised to find that the hospital was not only practicing forced abortions and other more widely known coercive population control techniques, but was actually killing live born babies. The IJ was similarly skeptical of Cao's testimony that she only became aware that infanticide was occurring after her department was put on the Ob/Gyn floor. The IJ concluded that "[Cao's] story that she didn't know what was going on is absurd."

The conclusion that Cao's testimony was not plausible was once again driven by the IJ's unwillingness to believe that Cao did not equate abortion and infanticide. The IJ opined,

Working in the same place for 17 long years, the respondent makes it seem as if she must have stayed in a cube the entire time that she was there . . . [Cao] never pieced together the fact that even though family planning officials were in her hospital, and that even though she

11

knew that they were performing *saline abortions* on women and probably other procedures to force abortions on women who were earlier in their pregnancies, that she never quite was able to put together how it was that other women who where already in their ninth month of pregnancy were having their pregnancies terminated.

(emphasis added). The IJ thus seems to have believed that since Cao knew there were abortions occurring, she should have ineluctably concluded that infanticide was also practiced. The IJ asked, "[H]ow could the respondent not know that infanticide was being practiced at that hospital where the family planning officials were terminating pregnancies in the ninth month?"

By accepting this reasoning, the IJ disregarded the seemingly logical explanation of why Cao did not discover the practice of infanticide until 1999. Cao testified that for the prior fifteen years she had worked in a different part of the hospital, which used a different entrance from the Ob/Gyn department. Thus, Cao said that she did not have contact with the Ob/Gyn patients prior to the 1999 relocation of her department. It was only when she was on the same floor as the Obstetrics ward and noticed women crying in the hall that she discovered infanticide was occurring. At all events, there is nothing in the record to support the IJ's statement that a pediatrician would have to "have stayed in a cube" not to know the specific practices of other medical departments located in physically different portions of the hospital. This conclusion is mere speculation and is unsupported by the evidence in the record.

The IJ's beliefs regarding abortion and infanticide similarly led her to dismiss the claim that Chinese authorities would have had an interest in concealing the practice of infanticide by arresting Cao, putting her under surveillance, and investigating her and the reporter Suen Yut. The IJ wondered why China would want to "cover up something that the world already knows about." She continued,

you would have to be an ostrich with your head in the sand if you were going to try to believe that China doesn't know that the world knows that it has been definitely involved in forced sterilization and abortions and terminations of pregnancy. Why the respondent

12

believes that China would want to suppress information that is already out and made public in the world is something beyond logic.

There are three apparent fallacies in the IJ's reasoning. First, while China does not deny that it has family planning regulations, the U.S. State Department's country profile states that the official Chinese government policy is that it "prohibits the use of force to compel a person to submit to abortion or sterilization . . . . [T]he [Chinese] Government does not condone the practice of forced abortion and . . . the responsible officials are disciplined and undergo retraining if it occurs." 1998 China Profile at 25. Even though there have been prior exposés of forced abortions and sterilizations, and even though the United States has recognized in the IIRIRA that such practices occur, the *Chinese* government apparently maintains that forced abortion and coerced sterilization are prohibited. A chronicle that local officials were violating the government policy would reveal a breakdown in Chinese central control---something an authoritarian government like China's would likely want to keep secret.

Second, even to the extent that the Chinese government might acknowledge that instances of forced abortion or sterilization nevertheless occur, *infanticide* is certainly *not* acknowledged by the Chinese government as a potential abuse of the population control policy, much less as an officially sponsored practice. Cao testified that the nurses told her infanticides were being conducted pursuant to *official* policy, yet infanticide is not even mentioned in the 1998 U.S. State Department report. Once again, the IJ's belief that forced abortion and infanticide are equivalent led her to the untenable conclusion that China would have no interest in suppressing stories that live born babies are killed after birth, when China does *not* publicly acknowledge that infanticide occurs.

Finally, the IJ's position that the Chinese government would not want to suppress criticism of otherwise well-known or even official policies is inconsistent with China's propensity to deal "harshly and arbitrarily" with "challenges to the CCP's political authority." 1998 China Profile, at 3. According to the U.S. State Department, the Chinese government continues to "use repressive measures such as intimidation, administrative detention, imposition of prison terms, house arrest, or exile to control tightly dissent" and

13

has displayed only "some limited tolerance of public expressions of opposition to government policies." *Id.* at 14. The IJ's supposition that China would not want to suppress an article that is critical of *any* government policy runs contrary to the nature of an authoritarian regime that brooks little criticism, particularly in the international press.

It is clear that late term abortion and infanticide are functionally different procedures. Neither party challenges the proposition that forced abortion and infanticide are abhorrent practices. The IJ's adverse credibility determination was in large part driven by her unwillingness to believe that *Cao* might make a moral distinction between infanticide and forced abortion, that she was motivated to take new action upon learning of the practice, or that the Chinese government would persecute Cao for exposing and criticizing the practice. In refusing to believe that Cao would make that moral distinction, the IJ did not rely on "specific, cogent reasons," *Dia*, 353 F.3d at 250, but on "speculation, conjecture [and] otherwise unsupported personal opinion." *Id*. Accordingly, the IJ's conclusion that Cao did not distinguish between the procedures lacks substantial evidence.

At oral argument, the government contended that the IJ's statements regarding infanticide and abortion were only incidental to her adverse credibility determination. We disagree. Cao's professed belief that infanticide is more reprehensible than forced abortion or sterilization was the motivating factor behind her decision to send the article to Suen Yut, which led to the persecution at the heart of Cao's asylum claim.

In sum, because the IJ equated forced abortion and infanticide, she declined to credit Cao's testimony about her attempt to expose the practice of infanticide and refused to believe the Chinese government would act to suppress Cao's article publicizing the stories of infanticide at her hospital. The IJ's unwillingness to recognize that Cao and others might recognize such a distinction was critical to her adverse credibility findings as to nearly every aspect of Cao's testimony and was unsupported by substantial evidence in the record.

2. The Other Credibility Determinations

In addition to her credibility determinations relating to

infanticide and abortion, the IJ discredited other portions of Cao's testimony.

### a) Interactions with Suen Yut

The IJ found an inconsistency between Cao's written asylum application and her testimony at the hearing regarding Cao's conversation with Suen Yut. In her testimony, Cao stated that Suen Yut asked her questions about infanticide. In her written asylum application, Cao said it was she who initiated the conversation and that the reporter became "indignant" upon learning about the practice of infanticide. The IJ seized on this small difference in the Cao's account, concluding that "from the very beginning, we're not talking the same story."

After reviewing the record, we cannot find support for the IJ's conclusion that Cao changed her story in any material respect. First, Cao's written asylum application does not state who initiated the conversation, but instead notes, "[Suen Yut and I] had a very pleasant conversation. I told him the wrong[]-doing at our hospital during the performance of the Birth Control Planning. He was indignant after know it." It is not clear from Cao's written application who brought up the specific topic of infanticide.

Moreover, contrary to the IJ's conclusion, there is no inconsistency in Cao's description of Suen Yut's reaction to her story about infanticide. In her oral testimony, Cao claimed that Suen Yut responded, "I cannot imagine in China today there is such corruption and . . . infanticide." In her written application, she states that he grew "indignant." The IJ seemed to believe it was not possible for someone could grow "indignant" about a practice of which he already had general knowledge stating, "the respondent stated in her written asylum application that when the reporter learned about [the practice of infanticide], he became indignant . . . . . Yet, in her testimony, the respondent is very clear that the reporter knew that this was going on . . . and he wasn't shocked and indignant at all . . . ."

We disagree that the IJ has identified any material inconsistency in Cao's statement that Suen Yut became "indignant" after discussing the practice of infanticide with Cao. First, there is nothing about the term "indignant" which requires an element of surprise. More importantly, the term "indignant" is a translation,

15

and thus this one choice of word should not be accorded determinative weight. This purported inconsistency was made much of by the IJ in holding against Cao; however, the IJ's reliance thereon is not supported by the record.

### b) Letter from Suen Yut

The IJ did not believe that the purported letter from Suen Yut to Cao was authentic. The first reason the IJ doubted the authenticity of this letter was that the letter lacked details relevant to Cao's asylum claim and "goes on to have basically three paragraphs of political diatribe irrelevant to this case." The letter did, however, state in the first paragraph that Cao had "suffered arrest, imprisonment and torture because she provided me the news clues, in which she reviewed the fact[] that [the] Chinese government kill[s] infants by medical means in nationality autonomous regions for the purpose of population control. She therefore escaped to your country to avoid further persecution." AR 434. The remainder of the Suen Yut's letter contained a general criticism of the Chinese government and its suppression of civil rights.

The second reason the IJ discounted the letter was Suen Yut's apparent lack of journalistic style: "it is amazing that a supposed reporter doesn't understand that [he] should provide this Court with supposed details and facts. In other words, frankly, the letter doesn't even sound like one that a reporter would have written." While criticizing the letter, on the one hand, for its absence of relevant information, the IJ wondered how Suen Yut knew of certain details regarding Cao's asylum claim because Cao's original letter detailing the facts about infanticide was intercepted by the Chinese authorities.

We find the IJ's critique of this letter to be unfounded. First, Suen Yut's letter does not contain any information about the contents of Cao's intercepted letter. Instead, Suen Yut's letter states only that Cao provided Suen Yut with "news clues" about the practice of infanticide, which could refer to the information discussed at the party. Moreover, Cao claimed that she had talked with Suen Yut and written to him after her release, but the IJ disbelieved this explanation because Suen Yut did not say that Cao had subsequently spoken with him in his letter.

16

Second, we do not believe Cao should be burdened with Suen Yet's supposed lack of journalistic acumen or his failure to know what facts are relevant to Cao's asylum claim under American law. Indeed, if the letter had displayed such sophistication and had contained only relevant facts, we might have reason to doubt its authenticity. While the IJ's point about the lack of authentication of the letter might justify giving this letter little weight, there is nothing about the letter which should create an *adverse* credibility determination against Cao.

### c) Cao's Escape from China

The IJ also did not find Cao's story of her escape from China to be credible. The IJ found it implausible that Cao was able to retain her passport, leave her province while under surveillance, get to the Shanghai airport, and bribe an official to obtain an exit permit. The IJ's incredulity, however, does not appear to be justified in light of Cao's clear explanation for each aspect of her escape, which is not undermined by anything in the record.

Cao testified that even though the authorities searched her home, they did not discover her passport, which she had stowed in a safety deposit box at a bank. Further, while Cao claimed she was under "surveillance" when she was released from detention, the record shows that "surveillance" meant that she had to go to public security every week to explain what she did that week, not that her movements were regularly observed by the authorities. Thus, there seems to be no implausibility about Cao's story that she was able to flee after her weekly interview.

The IJ could not believe that Cao could bribe a public official for her exit visa, stating "[Cao] may want to pretend that it's all okay because she had to pay a bribe, but the bribe was paid to a public official. Why would any public official dare, in China, the most repressive government we can imagine[?]" This argument is dispatched by our opinion in *Dia*, 353 F.3d at 252. There, the IJ rejected the petitioner's similar claim that a Guinean policeman helped him cross the police border for a bribe of 300,000 Guinean francs, which was equivalent to about 150 U.S. Dollars. The IJ "question[ed] why this policeman would risk his reputation, not to mention, his life, to assist the respondent, a wanted political opponent, evade detection by the police . . . for . . .$150." We

17

rejected the IJ's contention in *Dia* because it was

> not explained, and appear[ed] to be pure conjecture. It is not only not based on the record, but, in fact, it contravenes key parts of it. The Country Report confirms that Guinean police extort money from citizens at road blocks and that corruption at road checkpoints is widespread and "systematic." In addition, figures contained in the record show that $150 U.S. is nearly a quarter of the per capita GDP in Guinea for 1999, a sum likely tempting to a policeman in a poor country replete with corruption within its police force.

*Id.*

As in *Dia*, the IJ's disbelief that such bribery would occur is controverted by the State Department's country profile which indicates that bribery is in fact widespread in China. *See* 1998 China Profile, at 22. Moreover, Cao testified the bribe was "30,000," although she did not specify if this figure was in yuan or U.S. dollars. In either dollars or yuan, however, this bribe was clearly a substantial sum. Given the evidence in the record that bribery is in fact widespread among Chinese officials and the potentially large amount of money involved, we find, as we did in *Dia*, that the IJ's opinion that a public official would not dare take a bribe in China is pure conjecture.

### d) Cao's testimony regarding her detention

The IJ found that Cao had been inconsistent in relating who had tortured and beaten her while she was in detention. In her written application Cao had claimed she was "tortured by the inmates" at "police[] instigation"; however, in her oral testimony she said that the people questioning and interrogating her were "in general" police officers, who "sometimes had uniforms, sometimes not."

We do not find a significant inconsistency between the two statements. At the hearing, Cao was asked only who *questioned* her and not who had *tortured* her—the statement that she was only questioned by officers is not inconsistent with the statement that she was tortured by inmates at the officer's instigation.

18

*e) Vagueness of her asylum application*

The IJ also expressed frustration that Cao's written asylum application was not supplemented when Cao obtained counsel. The IJ says that the "application doesn't seem to say anything" and was "intentionally vague," such that the application's "tricky little vaguely written manner and presentation" prevented her from making credibility determinations or assessing the validity of the claims. The IJ stated that Cao thereby left herself with an "opportunity to not only add information to her case, but actually change the entire claim, in terms of the basic presentation of facts."

A review of the Cao's written asylum application, however, does not support the IJ's scathing characterization. Rather, Cao's four-page, type-written statement lays out, in material terms, all of the claims and allegations made in her oral testimony. She describes in some detail how she discovered the infanticide practices, how the infanticide procedure was done, her encounter with Suen Yut at the party, the interception of the letter to Suen Yut, her detention, and her escape to the United States. We therefore disagree that the application would have allowed Cao to "change her entire claim."

One way in which the IJ claimed that Cao used strategically open-ended language is that Cao's written application states that she was "arrested" after the letter to Suen Yut was intercepted but her oral testimony specified that she was "arrested at home" and provided additional details about the arrest incident. The IJ found this "convenient because there is no way that the Court can determine whether she is being consistent with the representations that were supposed to have been written down." Similarly, the IJ found suspicious that Cao had written that she was interrogated "several times" whereas she refined this statement in her oral testimony to the more specific "six times."

Cao testified, in response to questioning from the IJ, that she did not include some of these details because she believed they were "very specific points" encompassed by her more general story. Whether or not this is so, we agree with Cao that the vagueness cited by the IJ does not constitute a meaningful omission which should lead the court to make an adverse credibility finding. *See Lopez-Reyes v. INS*, 79 F.3d 908, 911 (9th Cir. 1996) ("[A]n applicant's testimony is not per se lacking in credibility simply

because it includes details that are not set forth in the asylum application."). These details are essentially collateral points. The increased specificity in her oral testimony as to certain aspects of her story does not justify the allegation that Cao was somehow intentionally vague in her application or that Cao would have been able to change her story in any material respect.

### f) Use of the Mail

Cao testified that she had mailed Suen Yut the letter detailing her story about infanticide through registered mail only after sending a test letter that arrived without detection. Cao represented that she believed it was "prudent" to test the security of the mail in this way and that, after the first letter went through, she felt it was relatively safe to send the second letter with the infanticide story.

The IJ did not believe that Cao would have mailed the letter to Suen Yut knowing that there was a risk that it could be intercepted. The IJ said:

> In other words, if that first [letter] was a trial or a test of whether her mail was going to be intercepted, then [Cao] absolutely knew that it was reckless and absurd to put something in the mail that was critical of the Chinese government, which tolerates no criticism. *This is one reason why this Court just can't believe this story*. Why the respondent would choose such a reckless route . . . is inexcusable and illogical and it just lacks the ring of truth.

(emphasis added).

The IJ similarly found "ridiculous" Cao's claim that she sent a letter, upon her release from detention, warning Suen Yut not to come to mainland China or to contact her. The IJ stated, "It is unbelievable that the respondent would have . . . mailed a warning to the same reporter after she had been supposedly put in jail for three months for mailing something else to him earlier." The IJ did not seem to credit Cao's testimony that she took further precautions in warning Suen Yut by having a friend mail the warning letter to Suen Yut from Hong Kong, not from mainland China.

20

In the same vein, the IJ doubted the authenticity of a letter allegedly sent from Cao's husband in China to Cao in New Jersey on November 11, 2001. In addition to informing Cao that public security officials had come to their house in China looking for her, the letter also criticized the Chinese government in other respects. The IJ's main reason for doubting the authenticity of the letter, however, was that she did not believe that "the respondent's own husband . . . again put something in the mail [that was] highly controversial, when the respondent herself testified that he is supposedly being threatened and surveilled and having guns pointed at him. I don't think that her husband would have mailed anything controversial in an envelope if this story is true." Later she wrote that "the Court just can't believe that anybody with a lick of sense, if this story were true," would have mailed a critical letter from China. The fact that Cao testified that her husband also mailed her the arrest warrant and the hospital dismissal certificate from China was also a factor in the IJ's denial of the authenticity of those documents.

While the IJ would surely not be compelled to credit Cao's testimony regarding her and her husband's risks in using the mail, in this case, we find the IJ's adverse credibility determination to be impugned by her rhetoric, which characterizes Cao's and her husband's conduct as "ridiculous," "reckless," "absurd," "inexcusable," and "without a lick of sense." While perhaps taking such risks is unusual, it is not implausible. Indeed, we can conceive of many instances where an individual would be willing to risk him or herself to protest a policy which he or she abhors or to protect a friend or loved one. *See Dia*, 353 F.3d at 255 n.24 (citing a number of reasons that a wife might urge her husband to flee the country without her and concluding that the IJ should have considered these "equally likely scenarios"). At all events, even deferring to the IJ's skepticism on this point, given the many errors already identified in the IJ's analysis, this alone would not be sufficient to support the IJ's overall adverse credibility finding.

C. *Application of the Substantial Evidence Standard*

Under the deferential "substantial evidence" standard we require an IJ to provide a "sound basis---whether supplied by the record evidence or by background knowledge---to support the IJ's

21

findings." *Dia*, 353 F.3d at 251. In *Gao* we stated,

> Adverse credibility determinations based on speculation or conjecture, rather than on evidence in the record, are reversible. Generally, minor inconsistencies and minor admissions that reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding. The discrepancies must involve the heart of the asylum claim.

299 F.3d at 272 (citations and internal quotation marks omitted). Here, a "sound basis" is wholly lacking. The portions of the IJ's opinion relating to infanticide and abortion are a function of the IJ's personal notions, which led her to draw untenable conclusions about Cao's claim. With respect to the other purported inconsistencies and implausibilities, each of these has proven to be based, not on evidence in the record, but on the sort of speculation or conjecture that *Gao* proscribes.

Finally, while we find IJ's conclusions with regard to the plausibility of Cao's testimony to be unsupported by the record, we reiterate that the IJ found Cao's observable demeanor to be, "quite perfect. She is the utter professional, very well spoken, and the Court is convinced that she is a well educated medical practitioner as she claims." Having explained why the IJ's credibility judgments are untenable, the IJ's finding that Cao's demeanor suggested truthfulness leaves no further bases on which to deny Cao's claim. *See Dia*, 353 F.3d at 252 ("Absent a reason such as implausibility or inconsistency based in the record, or that [petitioner's] demeanor in some way led her to question his veracity, the IJ should not have summarily dismissed [petitioner's] testimony . . . .").

In sum, we conclude that the IJ's adverse credibility finding is not supported by substantial evidence in the record. We will therefore grant Cao's petition for review of the order of the BIA, vacate the BIA's order, and remand the matter to the BIA for further proceedings.[4]

---

4 While we find that the IJ lacked substantial evidence to make the adverse credibility determination, we note that we are not

finding Cao to be credible nor determining Cao's eligibility for relief. This determination is for the BIA in the first instance on remand. *See INS v. Ventura*, 537 U.S. 12, 16-17 (2002) (requiring the court of appeals to remand the ultimate question of eligibility for relief to the BIA); *Dia*, 353 F.3d at 260-61 (remanding to the BIA to clarify or supplement the record without regard to the prior, erroneous credibility determination).