[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 1, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-12763
Non-Argument Calendar

_____

Agency No. A97-193-675

AMONNON LOUIS,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(April 1, 2008)**

Before BIRCH, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

Amonnon Louis, through counsel, petitions for review of the decision of the

Board of Immigration Appeals affirming the order of the immigration judge ("IJ")

denying his claims for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), and relief under the United Nations Convention Against Torture ("CAT"). He challenges the IJ's adverse credibility finding, argues that the IJ failed to consider corroborating evidence, and erred in finding that he had no well founded fear of future persecution. We DENY the petition.

## I. BACKGROUND

In 2004, the Department of Homeland Security served Louis, a native and citizen of Haiti, with a notice to appear, alleging that he was an alien who had remained in the United States for a time longer than permitted, in violation of 8 U.S.C. § 1227(a)(1)(B). Louis admitted the allegations, but sought asylum and withholding of removal.

In his application, Louis stated the following: He was seeking asylum based on his political opinion which was in opposition to the Lavalas Party. He was president of the "Cooperation pour la Promotion de la Production Nationale d'Haiti" ("CPPNH"). AR at 137-38. In November 2002, he participated in a panel that denounced the Aristide government for its violations of the constitution. Immediately after the panel discussion, Felix Bien-Aimé, a member of Lavalas, led a dozen people in an attack on Louis at his home. The attackers told Louis that the panel was going to be the last time he spoke about the government. Louis's neighbors stopped the beating and prevented Bien-Aimé and the others from taking

2

Louis away. As he left, one of the attackers struck Louis with the butt of a gun and screamed, "long lives Aristide and down with Convergence." Id. at 142. Convergence was a party opposed to Lavalas.

After the attack, Louis went into hiding. His neighbors reported to him that three men in a truck came looking for him on an almost daily basis. He decided that his life was in danger and it was in his best interest to move to Miami. Louis feared going back to Haiti because he believed that Bien-Aimé would kill him. Louis reported that the vice-president of CPPNH told him to stay in Miami. Louis also mentioned in the application that he had been arrested twice because of his political opinion, and had been accused of being in the Convergence Party because he was not part of the Lavalas Party.

In support of his application Louis submitted, among other things, the following evidence: (1) his membership card for the Haitian Christian Democratic Party; (2) his membership card for the CPPNH, which stated that he was the president and founder; (3) a print-out from a website that was selling "Rethinking Haiti," a book that Louis coauthored; (4) a letter from members of CPPNH; (5) a reference letter, which stated that Louis had helped create jobs in Haiti; and (6) a letter from Louis's wife. The letter from the CPPNH members stated that Louis was their president, that they had been shut down by the school board, and that Louis had left involuntarily because his life was in danger. The letter from his wife

3

stated that Louis had opened a factory where clothing was made, but that a branch of the school board had seized the building, leaving the factory without a space in which to reopen. His wife added that one day Bien-Aimé had come to their home and threatened to kill Louis.

At his asylum hearing, Louis testified to the following: He was a member of the National Democratic Christian Party of Haiti. In 1998, he had founded the CPPNH to promote work and Haitians getting involved in their government. The CPPNH had not affiliated with any political party. In early 1998, Louis spoke with the mayor of Delmas about obtaining a government sponsored "local" for storing the goods that the CPPNH produced. Id. at 68. The mayor asked Louis if he would register the CPPNH under the Lavalas Party, but Louis refused.

Nevertheless, the mayor gave the CPPNH a building in which to store materials. The CPPNH building was in a five-building complex, and the four other buildings were being used by a school board. Louis reported that, in December 1999 – after nearly two years, a school board representative and three armed security guards confronted Louis at the building. They assaulted him, told him that CPPNH would no longer occupy the building, and then locked him out. To avoid further confrontation, Louis then went to the police station where they allowed him "sit down and calm [him]self." Id. at 71. Later that day, he went home. After that incident, Louis received threats that he would die unless he registered the CPPNH

4

as part of the Lavalas Party.

He further testified that, in May 2002, men dressed as policemen had beat and arrested him.  Louis believed that they were not really policemen because the men could not identify themselves as police officers, and when they brought him to the police station in Port-au-Prince, the real police asked the men how they could arrest someone without a warrant.  Louis identified these men as members of the "OP, [or] Popular Organization."[1]  Id. at 73.  The real police held Louis overnight and released him the next day when a judge so ordered.  The IJ noted that Louis had not described this incident in detail in his asylum application.

Louis continued, testifying that later that same month, the real police had arrested him because Bien-Aimé had filed a complaint.  Bien-Aimé claimed that Louis had assaulted his wife.  Louis was brought before a court within hours of being arrested.  After hearing testimony from Louis and Bien-Aimé, the judge determined that there was no foundation for the charges and ordered Louis's release.

Louis then described how, on 20 August 2002,[2] Bien-Aimé and 12 others came to Louis's home and started beating him.  They hit him and told him "this

---

[1]"Popular organizations" were pro-Lavalas paramilitary groups.  See AR at 236-37.

[2]There is some confusion in the record as to the date of this attack.  In his asylum application, Louis describes it as having taken place on 1 November 2002.  At the hearing, he refers to it having happened sometime in August 2002.

5

[was] the last time [he was] going to talk about the Lavalas." Id. at 79. Louis's neighbors came to his defense and prevented Bien-Aimé and the men from taking him away. However, Louis was forced to leave home after the incident. Louis stated that Bien-Aimé had attacked him because he had criticized the government at a debate his organization had sponsored.

Louis asserted that he was well known in Haiti for his political opinion and his organization's activity. Louis testified that he had written a book entitled "The Retaking of Haiti," and that he was working on another book titled "Haiti in Coma." Id. at 85. Louis feared that if he returned to Haiti, he would be killed. He explained that some of his colleagues were in hiding because they had been accused of being rebels responsible for Aristide leaving. Louis reported that one of his friends had been killed for helping Louis leave Haiti.

On cross-examination, Louis stated that he was aware that Aristide was no longer in power, but that Lavalas was still very powerful. He admitted that he had heard rumors that Bien-Aimé had been arrested by the police in September 2002. He also conceded that his wife and children continue to live in Haiti.

The record contains a 2005 U.S. State Department Country Report on Human Rights Practices ("2005 Report"). The report states that, as of the date of the report, Aristide and the Lavalas Party were no longer in power and that Aristide had left Haiti. The 2005 Report further stated that arbitrary killings had taken

place, politically motivated disappearances had occurred, and that there was politically motivated violence. The majority of the violence described in the report was direct against Aristide/Lavalas supporters. A 2002 U.S. State Department Country Report on Haiti ("2002 Report") stated that Bien-Aimé had been detained by the Haitian National Police and that human rights organizations believed he was dead. An article in the New York Sun stated that Bien-Aimé had disappeared after having threatened to blackmail some of his former associates about the murder of a baby. The article further stated that his partly burned car was found near Ti Tanyen, a killing field in Haiti.

Having considered the testimony and the documentary record, the IJ issued an oral decision. The IJ noted that Louis had testified and submitted various documents in support of his asylum application. However, he had failed to describe his two arrests in his asylum application with the detail in which he had described them during his oral testimony. Further, Louis's oral description of the reasons for the arrests conflicted with the asylum application because the application stated that he had been arrested for being part of Convergence, but in his oral testimony he did not even mention Convergence, much less explain how Convergence fit into the arrests. Based on these inconsistencies, the IJ found that Louis lacked credibility.

The IJ also found that Louis had failed to show past persecution or a well-

founded fear of future persecution. As to past persecution, the record demonstrated that anytime Louis came into contact with the "official apparatus" of Haiti, except with regard to his eviction, he was treated fairly. Id. at 38. As to a well-founded fear of future persecution, all reports were that Bien-Aimé was dead, the Haitian government had changed, and there was no indication that anyone in the Haitian government was "out to get" Louis. Id. Based on these findings, the IJ ordered that (1) Louis's application for asylum and withholding of removal be denied; (2) relief under the CAT be denied; and (3) Louis be removed and deported to Haiti.

In his counseled appeal to the BIA, Louis attacked the IJ's credibility determination by arguing that it had not constituted omission for his asylum application to contain less detail than his testimony. He further argued that his failure to mention the Convergence Party during his testimony had not been inconsistent because the Convergence Party was in political opposition to the Lavalas Party. Louis also asserted that there was other corroborating evidence of his problems with the government. He argued that there was sufficient evidence of violence in Haiti to support his well founded fear of persecution.

The BIA issued a written order affirming the IJ. The BIA found "no clear error" in the adverse credibility determination, explaining that Louis's "failure to mention his arrests in his application, and the other omissions and inconsistencies, were appropriately considered by the [IJ]." AR at 2. The BIA reasoned that Louis

had had ample opportunity to explain the discrepancies during his oral testimony and that it had been Louis's burden to establish his eligibility for relief. The BIA also explained that Louis's claim of continued violence in Haiti was not a proper basis for challenging the IJ's finding of ineligibility.

In his timely petition for review, Louis argues that (1) the IJ's adverse credibility finding was not supported by substantial evidence; (2) the IJ relied solely on the adverse credibility finding and did not consider other documentary evidence; and (3) the IJ's finding that there was no past persecution or that he lacked a well-founded fear of future persecution was not supported by substantial evidence.

## II. DISCUSSION

When the BIA issues a decision, we review only that decision, except to the extent that the BIA expressly adopts the IJ's decision. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). To the extent that the Board adopts the IJ's reasoning, we review the IJ's decision as well. Id. Here, because the Board gave the IJ's reasons and stated that there was no clear error, we also review the IJ's decision.

When evaluating a petition for review of a decision by the BIA, we review findings of fact under the "substantial evidence test," and must affirm the decision "if it is supported by reasonable, substantial, and probative evidence on the record

9

considered as a whole." Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005) (quotation omitted). Under the "highly deferential" substantial evidence test, we "consider only 'whether there is substantial evidence for the findings made by the BIA, not whether there is substantial evidence for some other finding that could have been, but was not, made.'" Adefemi v. Ashcroft, 386 F.3d 1022, 1029 (11th Cir. 2004) (en banc) (citation omitted). We review the record evidence in the light most favorable to the agency's decision and may not overturn findings of fact unless the record compels it. Forgue, 401 F.3d at 1287. Finally, the BIA is "entitled to rely heavily" upon the State Department country reports. Reyes-Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1243 (11th Cir. 2004).

An alien who arrives in or is present in the United States may apply for asylum. 8 U.S.C. § 1158(a)(1). The Attorney General or Secretary of DHS has discretion to grant asylum if the alien meets the INA's definition of a "refugee." § 1158(b)(1). According to this definition, a "refugee" is

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). The asylum applicant carries the "burden of proving

10

such statutory 'refugee' status." Al Najjar, 257 F.3d at 1284. To establish asylum eligibility, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287. To demonstrate the connection between the alleged persecution and the listed factor, the petitioner must "present specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution on account of" that factor, or that he or she is a member of or is identified with a group that is subjected to a pattern of persecution. Al Najjar, 257 F.3d at 1287; see also Djonda v. U.S. Att'y Gen., __ F.3d __, __, 2008 WL170378 at *5 (11th Cir. 2008) (citing 8 C.F.R. § 208.13(b)(2)(iii)). An asylum applicant may not show merely that he has a political opinion, but must show that he has been persecuted because of that opinion. See INS v. Elias-Zacarias, 502 U.S. 478, 483, 112 S. Ct. 812, 816 (1992). We have held, for this purpose, that "'persecution' is an 'extreme concept,' requiring 'more than a few isolated incidents of verbal harassment or intimidation,' and that '[m]ere harassment does not amount to persecution.'" Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005) (per curiam) (citation omitted).

If the alien establishes past persecution, it is presumed that his life or freedom would be threatened upon return to the country of removal unless the

11

government shows by a preponderance that the country's conditions have changed such that the applicant's life or freedom would no longer be threatened or that the alien could relocate within the country and it would be reasonable to expect him to do so. 8 C.F.R. §§ 208.13(b), 208.16(b). An alien who has not shown past persecution may still be entitled to asylum if he can demonstrate a future threat to his life or freedom on a protected ground in his country. 8 C.F.R. §§ 208.13(b)(2), 208.16(b)(2). To establish a "well-founded fear," an applicant must show that he has a fear of persecution in his home country and that "[t]here is a reasonable possibility of suffering such persecution if he or she were to return to that country." 8 C.F.R. § 208.13(b)(2)(i)(B). We have opined that "the precise contours of the 'well-founded fear' inquiry continue[] to evolve." Al Najjar, 257 F.3d at 1289. However, we have held that "an applicant must demonstrate that his or her fear of persecution is subjectively genuine and objectively reasonable." Id. "The statutes governing asylum and withholding of removal protect not only against persecution by government forces, but also against persecution by non-governmental groups that the government cannot control." Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1257 (11th Cir. 2006) (per curiam).

We review credibility determinations under the substantial evidence test and in so doing we "may not substitute [our] judgment for that of the BIA with respect to credibility findings." D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 818 (11th

12

Cir. 2004). To constitute an adverse credibility determination, the IJ or BIA must have stated explicitly that the applicant's testimony was not credible. See Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005) (holding that an IJ's statement that applicant's testimony "was extremely inconsistent and [made] no sense whatsoever" was not a credibility finding but a comment on the sufficiency of the evidence). "Further, the IJ [or BIA] must offer specific, cogent reasons for an adverse credibility finding." Forgue, 401 F.3d at 1287. Thereafter, the burden falls upon "the applicant alien to show that the IJ's [or BIA's] credibility decision was not supported by specific, cogent reasons or was not based on substantial evidence. A credibility determination, like any fact finding, may not be overturned unless the record compels it." Id. (citations and quotations omitted).

If credible, an alien's testimony may be sufficient, without corroboration, to sustain his burden of proof in establishing his eligibility for relief from removal. Id. "Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application." Id. However, if an applicant produces evidence other than his testimony, "it is not sufficient for the IJ to rely solely on an adverse credibility determination." Id. Finally, a petitioner's omission of incidents of persecution from an asylum application and subsequent introduction of those incidents for the first time at the asylum hearing lend support to an adverse credibility determination. See id. However, as the Second Circuit

13

has recognized, "where the perceived incongruities in an asylum applicant's testimony are not plainly obvious, an IJ cannot rely on them to support an adverse credibility ruling without first identifying the alleged inconsistencies for the applicant and giving the applicant an opportunity to address them."[3] Min Shi Xue v. Bd. of Immigration Appeals, 439 F.3d 111, 121 (2d Cir. 2006); see also Cao v. Att'y Gen., 407 F.3d 146, 160 (3d Cir. 2005) (vagueness in asylum application does not constitute a meaningful omission upon which one may base an adverse credibility finding); Lopez-Reyes v. INS, 79 F.3d 908, 911 (9th Cir.1996) ("[A]n applicant's testimony is not per se lacking in credibility simply because it includes details that are not set forth in the asylum application.").

A. Credibility

In this case, the IJ made an explicit adverse credibility finding, offering two specific reasons therefor: (1) the lack of detail in the asylum application about the two arrests and inconsistency with respect to the reasons offered for those arrests;

---

[3]In Ming Shi Xue, the Second Circuit explained that it adopted this rule, in part, because without it, an appellate court called upon to review the decision of an immigration judge may be left unable to determine whether the IJ has properly discharged his responsibility of considering the asylum seeker's explanations. Ming Shi Xue, 439 F.3d at 124. Under the INA, IJs "play an affirmative role in developing, along with the parties, a complete and accurate record on which to decide" an asylum claim. Id. at 118; see also 8 U.S.C. § 1229a(b)(1) (directing that an IJ "shall administer oaths, receive evidence, interrogate, examine and cross-examine the alien and any witnesses"); Gidday v. Gonzalez, 434 F.3d 543, 549-50 (7th Cir. 2006) ("An immigration judge, unlike an Article III judge, is not merely the fact-finder and adjudicator but also has an obligation to establish the record."). We agree with the Second Circuit that when, despite this, "an IJ fails to produce a complete and detailed record, the justification for deferring to the IJ's findings is substantially diminished." Id. at 124.

14

and (2) Louis's failure to explain his mention of the Convergence Party in his asylum application. Louis stated in his application that he had been arrested twice, but wrote only that it was because he had been accused of membership in the Convergence Party. At the hearing, Louis gave specific details about the arrests. He explained that the first time he had been arrested by fake police and that the second time he had been arrested because Bien-Aimé had filed a fabricated complaint accusing Louis of being aggressive toward his wife. Louis offered a great many details in each case but never mentioned the Convergence Party. However, he did identify the fake police involved in his first arrest as members of a Popular Organization, a pro-Lavalas paramilitary group. Similarly, Louis explained in the course of his testimony that Bien-Aimé, who was responsible for his second arrest, was also pro-Lavalas, and he recounted how Bien-Aimé and the others who attacked him at his home had specifically warned him not to speak out against Lavalas.

The BIA affirmed the IJ's adverse credibility finding, stating that Louis had failed to mention the arrests in his application, and that the IJ had properly considered that fact. Our review of the record, however, confirms that Louis did mention the arrests in his application. They are also mentioned, though only cursorily, in one of the letters he submitted in support of his application. Additionally, the inconsistencies alleged by the IJ as to Louis's stories of his two

arrests are not readily apparent; they arise primarily from the fact that he offered greater detail in his testimony than in his application. The IJ never asked Louis about the perceived inconsistencies, thereby leaving him no opportunity to explain. When the IJ's decision pointed out the problems, Louis was able to explain, in his brief on appeal, how there was no inconsistency. The Country Reports and other documentary materials in the record addressing the political situation in Haiti confirm that Convergence was a political organization in opposition to Lavalas, and that Bien-Aimé and Popular Organizations were pro-Lavalas. Accordingly, we can find no substantial evidence in the record to support the reasons offered by the IJ for the adverse credibility finding. See Min Shi Xue, 439 F.3d at 121; Cao, 407 F.3d at 160; Lopez-Reyes, 79 F.3d at 911.

B. Past and Future Persecution

However, substantial evidence does support the IJ and BIA's finding that Louis has not demonstrated a well-founded fear of future persecution.[4] Because he failed to show past persecution, the burden was on Louis to show a well-founded

---

[4]Because Louis did not brief the issue of past persecution in this appeal, he has abandoned it. Sepulveda, 401 F.3d at 1228 n.2. (confirming that issues not briefed on appeal are abandoned). Even if this were not the case, there was substantial evidence to support the IJ's finding that Louis did not suffer past persecution because the record shows that whenever Louis was brought before a judge or higher government authority in Haiti, his rights were protected. Finally, even if there had been past persecution, Bien-Aimé's reported death and the fall of the Lavalas party constitute substantial evidence of changed conditions in Haiti. Accordingly, Louis has failed to demonstrate statutory "refugee" status on this basis.

16

fear of future persecution. See 8 C.F.R. §§ 208.13(b)(2), 208.16(b)(2). Louis stated that he was afraid that Bien-Aimé would kill him if he returned to Haiti, but the 2002 Report stated that Bien-Aimé had been detained by the Haitian National Police and that human rights organizations believed he was dead. Further, Aristide and the Lavalas Party are no longer in power in Haiti. Although, the Country Reports do indicate continued politically motivated violence, it is now more often directed against pro-Lavalas/Aristide groups rather than committed by them. Thus, there was substantial evidence to support the IJ's finding that Louis had no well-founded fear of future persecution and therefore failed to demonstrate refugee status. See Reyes-Sanchez, 369 F.3d at 1243.[5]

### III. CONCLUSION

Louis petitions for review of the BIA's affirmance of the IJ's decision denying him asylum. Although there is no substantial evidence to support the adverse credibility finding, the record does contain substantial evidence to support the IJ's finding that Louis had no well-founded fear of future persecution. Accordingly, we **DENY** the petition.

---

[5]Louis petitions for review only of the BIA decision regarding his asylum claim. Even if that were not the case, when a petitioner fails to "establish a claim of asylum on the merits, he necessarily fails to establish eligibility for withholding of removal or protection under CAT." Forgue, 401 F.3d at 1288 n.4.